Jasper J. MORRISON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 14467.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 12, 1958.

Decided Oct. 16, 1958.

Mr. John T. Bonner, Washington, D. C., for appellant.

Mr. Nathan J. Paulson, Asst. U. S. Atty., for appellee. Mr. Oliver Gasch, U. S. Atty., and Messrs. Carl W. Belcher, Joseph M. Hannon, and John W. Kern, III, Asst. U. S. Attys., were on the brief for appellee.

Before PRETTYMAN, WILBUR K. MILLER, and WASHINGTON, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant Morrison was convicted of committing a perverted act on a young boy, aged ten or eleven.[1] The offense allegedly took place in Morrison's home. This was a one-story building with a basement. Morrison, who was a construction worker, was building the house himself, and it was only partly constructed. The front door had been installed and at the time of these events was locked. No doors had been installed in the passageway from the outdoors to the basement or from the basement to the living quarters. These two openings were partially blocked by pieces of plywood. Despite its unfinished condition Morrison lived in the house, alone.

The record is not altogether clear as to the precise time of the events involved. The clearest allegations are that the offense occurred about four o'clock in the afternoon, that the boy related the affair to his grandmother, the grandmother told his mother, and she in turn notified the police. She did not await their arrival, however, but went to the grocery store. The officers arrived at about 5:45 p. m. The boy and an older brother were at home, and they got into the scout car with the officers and pointed out Morrison's home. In front of this house was another brother of the boy involved. This brother apparently assured the officers that Morrison was in the house; he (the boy) had been sitting on his grandmother's porch, two doors away, and was sure he would have noticed Morrison's departure. One of the officers knocked on the front door several times but received no response. Then the officer walked around to the back of the house, through the opening into the basement, upstairs, and through the opening into the living quarters. He then opened the front door and admitted his brother officer. They searched the house for Morrison, but he was not there. At that point the three boys came into the house, and the one involved in the alleged offense showed the officers the room in which he said the affair had occurred and pointed out a handkerchief which he said had been used by Morrison and which allegedly bore some tangible evidence of the offense. The officers took the handkerchief. The introduction of this article as evidence at the trial is the disputed point now before the court. Morrison says his motion to suppress should have been granted, because the search and the seizure were illegal, in violation of the Fourth Amendment.

Either of two propositions is dispositive of this appeal, and either requires reversal.

■ 1. The handkerchief was merely evidentiary material. It clearly was not the instrument or means by which the crime was committed, the fruits of a crime, a weapon by which escape might be effected, or property the possession of

---

1. A violation of Sections 103 and 104, Title I, of an Act of June 9, 1948, 62 Stat.

347, D.C.Code §§ 22-3501, 22-3502 (1951).

which is a crime. The Supreme Court said in Harris v. United States:[2]

> "Furthermore, the objects sought for and those actually discovered were properly subject to seizure. This Court has frequently recognized the distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime."

This distinction was established in United States v. Lefkowitz[3] and in Gouled v. United States.[4] In Gouled the evidence was seized under the authority of a search warrant; in Lefkowitz it was taken during a search incident to an arrest made with an arrest warrant. In both cases the Court held the evidence inadmissible as seized in violation of the Fourth Amendment. In Lefkowitz the Court said:[5]

> "Respondents' papers were wanted by the officers solely for use as evidence of crime of which respondents were accused or suspected. They could not lawfully be searched for and taken even under a search warrant issued upon ample evidence

2. 331 U.S. 145, 154, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399 (1947).

3. 285 U.S. 452, 464–465, 52 S.Ct. 420, 423, 76 L.Ed. 877 (1932).

4. 255 U.S. 298, 309–311, 41 S.Ct. 261, 265, 65 L.Ed. 647 (1921).

5. Supra note 3.

6. Numerous cases validate the seizure of mere evidence from the *person* of one who has been legally arrested, but obviously those cases are not applicable here. E. g., Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914); United States v.

and precisely describing such things and disclosing exactly where they were. Gouled v. United States, 255 U.S. 298, 310 [41 S.Ct. 261, 265, 65 L.Ed. 647]."

*A fortiori,* if purely evidentiary material may not be seized even under a search warrant, as in Gouled, or as an incident to an arrest under an arrest warrant, as in Lefkowitz, it cannot be seized legally without any warrant whatsoever and without any arrest.[6]

In the case at bar the officers were making a search of the house, primarily for Morrison himself (a matter we shall discuss in a moment), but indisputably a search. It was of a private home and without permission or a warrant of any kind, and without an arrest being made. We do not have here the problem of the admissibility of purely evidentiary material seized on the premises occupied by a defendant when he was arrested, or seized under a search warrant. The circumstances here are akin to the general search for evidence so vigorously condemned in our jurisprudence. The Supreme Court spoke clearly in Harris, in Lefkowitz, and in Gouled, all supra.

But it is argued that the officers were validly searching for Morrison to arrest him and that the handkerchief was in plain sight and so could be seized. That brings us to the second question.

2. Was the officers' entry legal? The factors for consideration are clear. This was a home. The officers had no warrant, either for arrest or for search.

Kirschenblatt, 16 F.2d 202, 203, 51 A.L.R. 416 (2d Cir. 1926), and cases there cited. In our Morton v. United States, 79 U.S.App.D.C. 329, 147 F.2d 28 (1945), certiorari denied 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428 (1945), the evidence was seized as an incident to the arrest, and the opinion appears to be in conflict with Lefkowitz but is sustainable upon the authorities cited, there having been no timely motion to suppress. In Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476 (1953), we held the seized evidence to be the fruits of the crime. Those cases are inapposite here.

We may assume they had reasonable grounds for two beliefs, (1) that a felony had been committed and (2) that the suspected felon was in the house. But they had no personal knowledge that he was there; they had neither seen nor heard him. The suspected felony was, as the Government phrases it, a "crime of gentleness"; by which is meant that it involved no breach of the peace, disturbance or injury. It involved no instrumentalities or fruits of crime. It had occurred, if at all, about two hours before the officers arrived.

The officers entered the house to make a search. It was, to be sure, a search for a person rather than the usual search for an article of property, but it was a search. The officers made this indubitably clear in their testimony; they went into the house to look for Morrison. It is true they intended to arrest him if they found him, and so the ultimate objective was an arrest. The Government urges that this latter fact requires that we apply the rules of law pertaining to arrest rather than the rules governing search. But the search was a factual prerequisite to an arrest; it was the first objective of the entry; the officers did in fact search the house. They entered to make a search as a necessary prerequisite to possible arrest.

This court has several times in recent years examined the problem of the invasion of private dwellings by police officers.[7] The Supreme Court has examined the problem many times.[8] We think it is unnecessary to discuss the matter again at any length.

We note the attempt of the Government here, as in some other cases, to equate the powers of an officer who has a warrant with those of one who does not have a warrant. Those powers are not the same and never have been in Anglo-American jurisprudence. A warrant of arrest is issued by some official authorized by law to perform that duty, usually a magistrate, and it directs the police or other officer to arrest the named person.[9] For example, a Commissioner's warrant in this jurisdiction begins with the words: "You are hereby commanded to arrest [the defendant]". Thereafter the police officer has no concern whatever with the question whether the person should or should not be arrested. The officer with a warrant has one duty and one duty only; he is to arrest the person. His powers under the warrant are designed to that purpose. The forefathers were concerned about the arrest of people. One critical aspect of their concern was the making of the decision that a person should be arrested. Out of that concern has grown the volume of rules which prescribe when a warrant must be had and when an arrest can be made without a warrant. There are vital differences. The power of an officer with a warrant cannot be equated with his power when he has no warrant.

We are assuming, *arguendo*, that the officers here had probable cause to believe both that a felony had been committed and that the felon was in the house; and that the officers entered for the sole purpose of finding and arresting the felon. The issue then becomes:

---

7. See, e. g., District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13 (1949), affirmed 339 U.S. 1, 70 S.Ct. 468, 94 L. Ed. 599 (1950), and Accarino v. United States, 85 U.S.App.D.C. 394, 179 F.2d 456 (1949), the latter cited and discussed with approval by the Supreme Court in Miller v. United States, ·357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

8. Examples, in addition to Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L. Ed.2d 1332 (1958), are Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); and Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958).

9. See, e. g., Restatement, Torts § 113.

Does a policeman without a warrant, but with probable cause to believe that a felony has been committed and that the felon is within his dwelling house, have a right to enter the dwelling when there is no response to repeated knocking on the door and when there is no urgency for an arrest? [10]

Without attempting to sort out the precise critical factor in each one of the great welter of decided cases, let us come directly to the point. The necessities of the moment make the difference between legal and illegal entries in the cases included within our question. For example, in Smith v. United States,[11] a typical narcotics case, the officers sent an informer into a house with marked money, and he returned in a few moments with narcotics but no money. To postpone arrest until a warrant could be sought would, under those circumstances, probably allow the fruits of the crime and contraband to be destroyed. The officers well knew this. We there sustained the entry without a warrant to make an arrest.[12] But no such circumstances existed in the present case.

In Accarino [13] we spelled out in detail the proposition that a search of a home without a warrant cannot be based merely on probable cause, that there must be some additional circumstance reasonably necessitating quick action. In Jones v. United States [14] the Supreme Court referred to the proposition as

established doctrine. In Accarino we quoted from District of Columbia v. Little [15] as follows: "We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate." [16]

▉ Morrison did not refuse admittance to the officers; he was not there. Under those conditions the basic principle of the rule governing searches and seizures comes into play. In Jones v. United States the Supreme Court stated again what it has many times held: "The decisions of this Court have time and again underscored the essential purpose of the Fourth Amendment to shield the citizen from unwarranted intrusions into his privacy", citing cases.[17] The reason for the rule is the protection of the right of privacy; it is not the prevention of a fracas, although that is certainly an important consideration. A man's home is just as private when he is not there as when he is. Police officers cannot, without a warrant of any kind, walk into an unoccupied, unlocked private home and search it, either for property or for a person. It would be a far departure from fundamentals, it seems to us, to hold that a man has a protected right of privacy in his home and its be-

---

10. The answer to this question is unrelated to the fact that the house is later found to be unoccupied. The entry is lawful or unlawful at the time it is made, and a subsequent search has the same legal character as the entry which made it possible. Whitley v. United States, 99 U.S.App.D.C. 159, 237 F.2d 787 (D.C. Cir., 1956); Mills v. United States, 90 U.S.App.D.C. 365, 367, 196 F.2d 600, 602 (D.C.Cir., 1952), certiorari denied 344 U.S. 826, 73 S.Ct. 27, 97 L.Ed. 643 (1952).

11. 103 U.S.App.D.C. 48, 254 F.2d 751 (D.C.Cir., 1958), certiorari denied 357 U.S. 937, 78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958).

12. Mattus v. United States, 11 F.2d 503 (9th Cir., 1926), Appell v. United States, 29 F.2d 279 (5th Cir., 1928), and Mullaney v. United States, 82 F.2d 638 (9th Cir., 1936), were narcotics cases similar on the facts to our Smith case, supra.

13. Accarino v. United States, 85 U.S. App.D.C. 394, 179 F.2d 456 (1949).

14. 357 U.S. 493, 497–499, 78 S.Ct. 1253, 1256–1257 (1958).

15. 85 U.S.App.D.C. 242, 246, 178 F.2d 13, 17 (D.C.Cir., 1949), affirmed 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950).

16. Supra, 85 U.S.App.D.C. at page 402, 179 F.2d at page 464.

17. Supra, 357 U.S. at page 498, 78 S.Ct. at page 1256.

longings so long as he is on the premises, but none when he is not there. Not only does such a proposition appear untenable on its face but the cases so indicate.

■ In United States v. Jeffers [18] the Supreme Court denounced the seizure of narcotics from the empty hotel room tenanted by the defendant's aunts. The Court's language in Taylor v. United States [19] describes the situation of the officers in the case before us when they had completed the first part of their search: "No one was within the place and there was no reason to think otherwise." Empty buildings within the curtilage are entitled to the privacy of the house.[20]

In Agnello v. United States [21] the Supreme Court said: "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." And in Work v. United States [22] we said: "However well intentioned, the entry into the home without a warrant of any kind was not under 'exceptional circumstances' dispensing with the necessity for a warrant. Accordingly, it was the beginning of an unreasonable search * * *."

The Government cites many cases, but we do not find in them the doctrine the Government urges. It also cites again cases it cited to us in Accarino, supra; we examined those cases there and refer here to that discussion.

In Love v. United States,[23] Paper v. United States,[24] Lane v. United States,[25] and Barrientes v. United States,[26] the officers had warrants. In Martin v. United States [27] a garage was held to be protected, but the circumstances seen and heard on the spot by the officer made the search reasonable. In Gibson v. United States [28] this court held an entry illegal where the officers had an arrest warrant for a man not in the house but gained admittance by implying that they had a search warrant. In Gatewood v. United States [29] we held illegal an entry by an officer who thought a bench warrant was outstanding whereas in fact it had been executed.

■ We think that under the authorities officers without a warrant cannot enter, even without actually breaking, a private dwelling to search for a suspected felon, no permission being given and no circumstances of necessitous haste being present.

It is significant that in the Harris case, supra, the Supreme Court took the trouble to note: "This is not a case in which law enforcement officials have invaded a private dwelling without authority and seized evidence of crime." [30] The case before us is precisely a case in which law enforcement officers invaded

18. 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

19. 286 U.S. 1, 5, 52 S.Ct. 466, 467, 76 L. Ed. 951 (1932).

20. E. g., a barn, Steeber v. United States, 198 F.2d 615, 33 A.L.R.2d 1425 (10th Cir., 1952), and a smokehouse, Roberson v. United States, 165 F.2d 752 (6th Cir., 1948).

21. 269 U.S. 20, 33, 46 S.Ct. 4, 6 (1925).

22. 100 U.S.App.D.C. 237, 238, 243 F.2d 660, 661 (1957).

23. 170 F.2d 32 (4th Cir., 1948), certiorari denied 336 U.S. 912, 69 S.Ct. 601, 93 L. Ed. 1076 (1949).

24. 53 F.2d 184 (4th Cir., 1931).

25. 148 F.2d 816 (5th Cir., 1945), certiorari denied 326 U.S. 720, 66 S.Ct. 25, 90 L.Ed. 427 (1945).

26. 235 F.2d 116 (5th Cir., 1956), certiorari denied 352 U.S. 879, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956).

27. 183 F.2d 436 (4th Cir., 1950), certiorari denied 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950).

28. 80 U.S.App.D.C. 81, 149 F.2d 381 (1945), certiorari denied 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945).

29. 93 U.S.App.D.C. 226, 209 F.2d 789 (1953).

30. 331 U.S. at page 153, 67 S.Ct. at page 1102, 91 L.Ed. 1399.

a private dwelling without authority and seized evidence of crime.

The judgment of the District Court must be reversed and Morrison awarded a new trial.

Reversed.

WILBUR K. MILLER, Circuit Judge, dissents.