383 A.2d 496

**COMMONWEALTH of Pennsylvania**

v.

**Andre SHAW, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued June 26, 1975.

Decided Jan. 26, 1978.

Joseph R. Danella, Lipschitz & Danella, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James J. Wilson, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Appellant Andre Shaw was charged with murder of the first degree, aggravated robbery, and burglary in connection with the May 2, 1972 shooting of Max DuBose and robbery of the Jamaica Inn. On March 21, 1973, a pre-trial motion to suppress an expended shotgun shell, a sawed-off shotgun

and two unexpended shotgun shells, was denied. A jury convicted appellant on all three charges, post-verdict motions were denied, and a sentence of life imprisonment was imposed. In this appeal, appellant contends that the court erred in denying his motion to suppress this evidence.[1] We agree, reverse judgments of sentence, and remand for a new trial.[2]

## I

On May 2, 1972, at approximately 1:00 p. m., three men robbed the Jamaica Inn and its patrons. One of the patrons, Max DuBose, was shot and killed during the incident, and the assailant and his accomplices fled. An eyewitness informed police of the shooting and robbery.

Lieutenant Donald Patterson supervised the investigation. He examined the victim's wound and determined that the gunman used either a small caliber shotgun or a large caliber rifle. Lieutenant Patterson interviewed eyewitness-

1. We hear the appeal from the judgment of sentence on the murder conviction pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1977). A separate appeal was taken to the Superior Court from the convictions on the other charges, and certified by the Superior Court, pursuant to the Appellate Court Jurisdiction Act of 1970, § 503, 17 P.S. § 211.503, to this Court.

2. Though appellant does not challenge the sufficiency of the evidence to sustain a conviction of murder of the first degree, this Court is required to consider that issue. Act of February 15, 1870, P.L. 15, § 2, 19 P.S. § 1187 (1964). Considering the evidence in the light most favorable to the Commonwealth, see *Commonwealth v. Kichline,* 468 Pa. 265, 271, 361 A.2d 282, 283 (1976); *Commonwealth v. Bastone,* 466 Pa. 548, 552, 353 A.2d 827, 829 (1976), we have concluded that the evidence is sufficient.

In addition to his argument that the trial court erred in failing to suppress evidence, appellant argues that the trial court erred in: (1) permitting the jury to have, upon retiring for deliberations, the handwritten notes of police interviews with appellant and appellant's formal typewritten statement; (2) failing to declare a mistrial following allegedly improper prosecutorial cross-examination of a defense witness; (3) failing to charge the jury on the purpose of an indictment; and (4) failing to charge the jury on voluntary manslaughter. Appellant also asserts that the suppression court erred in refusing to suppress inculpatory statements given by appellant to police. Our disposition makes it unnecessary to reach any of these issues.

es, who described the race and approximate height, weight, and age of the assailant and his accomplices. One eyewitness reported the general direction in which the three men headed. An eyewitness said that one of the men associated with "a fellow by the name of Shaw." Lieutenant Patterson checked police records, discovering that a Shaw family lived on North 57th Street, in the same direction the assailant and his accomplices had fled.

Testimony at the suppression hearing revealed that Lieutenant Patterson conveyed to Detectives Mitchell and Anderson all this information and sent them to the Shaw residence to interview Donald Shaw and any other persons at the Shaw residence.[3] At approximately 3:00 p. m., as the detectives drove toward the Shaw residence, Detective Mitchell observed an unidentifiable person peeking out of a second floor window of the house. The detectives circled the block and called for a stake-out unit and additional support. When the additional support arrived, police surrounded the house and Detectives Mitchell and Anderson, accompanied by two stake-out officers, approached the Shaw residence.

The police knocked at the door and a teenage sister of appellant answered. After the detectives identified themselves and informed appellant's sister that they were investigating a homicide, Detective Mitchell asked to speak to Donald Shaw. The sister replied that Donald was home, admitted the officers into the house, and called upstairs for Donald. There was no response, and she called again. Still there was no response. However, the detectives did hear shuffling noises, described by Detective Anderson as the sound made by somebody walking. After a pause of one or two minutes, Detective Anderson and the two stake-out officers, without the permission of the sister, ran upstairs.

Detective Anderson, the first policeman to reach the second floor, testified at the suppression hearing that he immediately confronted appellant Andre Shaw, who was

**3.** The record does not indicate the reason Lieutenant Patterson told Detectives Mitchell and Anderson to interview Donald Shaw specifically.

coming out of a second floor room. Detective Anderson asked appellant his name and, after appellant replied, told appellant to stop and turn around. Detective Anderson patted appellant's clothing and removed from appellant's pocket an expended .410 gauge shotgun shell. The stake-out officers found four other persons, including Donald Shaw, on the second floor. Though eyewitnesses stated that there were three perpetrators of the incident at the Jamaica Inn, all five persons on the second floor—appellant Andre Shaw, Donald Shaw, and three others—were taken, at approximately 3:30 p. m., into custody.

Police immediately transported appellant to police headquarters. At 5:45 p. m., Officer Thornton warned appellant of his *Miranda* rights and began to question him. Appellant denied any involvement in the crimes throughout the first interview, made an oral statement at 8:00 p. m. admitting participation in the crimes, repeated the details of his involvement at 11:15 p. m., and signed a typewritten, inculpatory statement at approximately 3:45 a. m.

Detective Mitchell obtained a search warrant at about 7:30 p. m. on the evening of the shooting and returned to the Shaw residence, where he served the warrant on appellant's mother.[4] The information to support probable cause included: the robbers were associates of Donald Shaw; Donald Shaw was found, along with four others, in the Shaw residence; Detective Anderson, after patting down appellant, found an expended shotgun shell in appellant's pocket; a medical examiner determined that the victim died from a small caliber shotgun wound; and two Shaw children, ages seven and nine, told detectives that "they took the shotgun

4. Mrs. Shaw, mother of appellant and Donald Shaw, testified that she returned home from shopping earlier in the day, when her sons and companions were in police custody at the Shaw residence. She stated that while the five men were in police custody, some of the police began to search both her pocketbook and the upstairs and downstairs of the house. She stated that one officer interrupted the search, and said, "Hold it, let's get a search warrant." Detectives Mitchell and Anderson testified that they did not conduct such a search; Detective Mitchell testified that he did not observe one.

550

into the cellar."[5]   Detective Mitchell and accompanying officers seized a sawed-off .410 gauge shotgun and two unexpended shotgun shells.

## II

The Fourth Amendment to the Constitution of the United States "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Accord, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1976); *Commonwealth v. Flewellen,* 475 Pa. 442, 380 A.2d 1217 (1977); *Commonwealth v. Strickland,* 457 Pa. 631, 326 A.2d 379 (1974); *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973); *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973). The reasonableness of a governmental intrusion varies with the degree of privacy legitimately expected and the nature of the governmental intrusion. *United States v. Chadwick,* supra; *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Terry v. Ohio,* supra.

"Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society." *Commonwealth v. Flewellen,* supra, 475 Pa. at ——, 380 A.2d at 1220. See *United States v. Chadwick,* supra; *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Terry v. Ohio,* supra; *Katz v. United*

5.   There is no indication in the suppression hearing record as to when the Shaw children made this statement.   The Commonwealth in its brief, however, states that the statement was made after the police came back downstairs.

*States,* supra; *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). Unquestionably appellant manifested such a legitimate expectation of privacy and thus was entitled to the protection of the Fourth Amendment as he engaged in his own affairs on the second floor of his family's home.

■ Detective Anderson and the stake-out officers, when they ran up the stairs of the Shaw residence, initiated a search for persons who may have been involved in the shooting and robbery at the Jamaica Inn.[6]  The search of the second floor of the Shaw residence was an intrusion upon appellant's legitimate expectation of privacy.  Such an intrusion must, at a minimum, be based upon a showing that the officers had probable cause to believe that persons sought were on the premises and that those persons committed the crime being investigated.  *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Commonwealth v. Flewellen,* 475 Pa. 442, 380 A.2d 1217 (1977); *Dorman v. United States,* 140 U.S.App.D.C. 315, 435 F.2d 385 (1970); *Morrison v. United States,* 104 U.S.App.D.C. 352, 262 F.2d 449 (1958); *Commonwealth v. Forde,* 367 Mass. 798, 329 N.E.2d 717 (1975); *People v. Eddington,* 387 Mich. 551, 198 N.W.2d 297 (1972).  See also *United States v. Santana,* supra; *United States v. Watson,* supra.

■ Here, no such probable cause existed.  The officers may have been justified in concluding that Donald Shaw was on the second floor, for his sister said he was home, she called upstairs for him, the officers saw somebody peeking out of a second floor window and heard somebody upstairs walking.  But the officers had no information which could

6. Nothing in the record indicates, and the Commonwealth does not argue, that appellant's younger sister gave Detective Anderson and the stake-out officers permission to go upstairs.  Compare *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), with *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

reasonably lead them to believe that Donald Shaw was a participant in the robbery and shooting at the Jamaica Inn. The only known connection between Donald Shaw and the perpetrators was that one witness alleged that Donald Shaw associated with them. Without more, no probable cause existed to believe that Donald Shaw was involved in the incident at the Jamaica Inn. Therefore the presence of police on the second floor of the Shaw residence and the resulting frisk and arrest of appellant violated appellant's legitimate expectation of privacy and cannot be justified on the ground that the police were properly looking for Donald Shaw.

■ Nor can it be said that Detective Anderson and the stake-out officers had probable cause to believe that other persons, involved in the shooting and robbery, were on the second floor of the Shaw residence. The police had no information that persons fitting the descriptions of the perpetrators had entered the Shaw residence. The police saw one person peeking out of the second floor window, but that person could neither be identified nor in any way connected with the incident at the Jamaica Inn. The only information which may have hinted that more than one person was upstairs or that such persons were linked with the incident was the statement of one witness that the perpetrators had fled in the general direction of the neighborhood in which the Shaws lived. Such information cannot alone constitute probable cause to believe that persons involved in the shooting and robbery were on the second floor. To hold otherwise and thus permit this police intrusion of privacy would be to endorse as reasonable the conclusion of the police that any person who is said to associate with suspected criminals will lend those persons support in criminal endeavors. This is a practice whose consequences members of an orderly society should not be required to bear.[7]

7. Because we conclude that the police did not have probable cause to intrude upon appellant's privacy, we need not decide whether the search conducted for persons is subject to the warrant requirement of the Fourth Amendment. To the extent that earlier cases suggest a distinction for Fourth Amendment purposes between searches of the

This situation differs markedly from that in *Commonwealth v. Flewellen, supra.* There, the police had probable cause to believe that the assailant was in the building where Flewellen lived, and thus their limited investigation was lawful. Information obtained while conducting their investigation could properly be considered in assessing whether probable cause existed to support the subsequent arrest of the defendant.

■ Attempting to justify the conduct of Detective Anderson and the stake-out officers, the Commonwealth states in its brief that these officers heard a police radio report that appellant Andre Shaw had been seen in an alley carrying a shotgun shortly after the shooting. The Commonwealth's assertion is not borne out by the suppression hearing record, and therefore the report cannot be used by the Commonwealth to justify the conduct of the police. *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977); *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892 (1975).

■ The Commonwealth also argues that these police officers, particularly Detective Anderson, conducted a per-

home for property and searches of the home for persons, see *Trupiano v. United States,* 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), the distinction may be inconsistent with the modern approach to Fourth Amendment issues, see *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and inconsistent with the modern approach to constitutional issues generally, see *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). Justice Jackson's often-quoted passage in *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), sharply focuses the need for a judicial warrant irrespective of the nature of the governmental intrusion:
"[t]he right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right to privacy must yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."
See also *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Morrison v. United States,* 104 U.S.App.D.C. 352, 262 F.2d 449 (1958); D. Rotenberg & L. Tanzer, "Searching for the Person to be Seized," 35 Ohio St.L.J. 56 (1974).

missible "stop and frisk" as contemplated by *Terry v. Ohio,* supra, and subsequent decisions. See *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The Commonwealth contends that when Detective Anderson confronted appellant on the second floor of appellant's home, Detective Anderson saw a person matching the general description of the assailant given him by Lieutenant Patterson. Thus, the Commonwealth argues, in view of the nature of the crime committed and the suspicious circumstances, Detective Anderson acted properly in stopping and frisking appellant.

What the Commonwealth ignores is that the Shaw residence is not a public thoroughfare. The officers may have been properly admitted into the Shaw residence and lawfully on the first floor of the premises. But the officers were not in a proper place when they went upstairs. No probable cause existed to support their intrusion upon the privacy legitimately expected by appellant while on the second floor. Without a proper basis for being upstairs, the officers were not lawfully in a position to conduct either the stop and frisk or the arrest of appellant but rather gained such a position through their own unlawful conduct. In these circumstances, *Terry* is simply inapposite.

## III

The expended shotgun shell, the sawed-off shotgun, and the unexpended shells were obtained through exploitation of illegal police conduct. The evidence must therefore be suppressed.

■ In deciding whether evidence obtained following illegal police conduct must be suppressed, we must consider:

" 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

*Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), quoting Maguire, Evidence of Guilt 221 (1959). Accord, *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Commonwealth v. Farley,* 468 Pa. 487, 364 A.2d 299 (1976); *Commonwealth v. Whitaker,* 461 Pa. 407, 336 A.2d 603 (1975); *Commonwealth v. Bailey,* 460 Pa. 498, 333 A.2d 883 (1975); *Betrand Appeal,* 451 Pa. 381, 303 A.2d 486 (1973). The burden of proving admissibility rests upon the Commonwealth. *Brown v. Illinois,* supra; *Wong Sun v. United States,* supra; *Commonwealth v. Farley,* supra.

The expended shotgun shell was obtained through the unlawful search of the second floor of the Shaw residence conducted on less than probable cause. The shell was removed by Detective Anderson from appellant's pocket while Detective Anderson was unlawfully on the second floor of the Shaw residence. It was obtained in the course of the illegal activity and therefore must be suppressed.

■ The sawed-off shotgun and the two unexpended shotgun shells seized pursuant to a search warrant must also be suppressed. In deciding whether a warrant issued in part upon information obtained through exploitation of illegal police conduct is valid, we must consider whether, absent the information obtained through the illegal activity, probable cause existed to issue the warrant. *Commonwealth v. Knowles,* 459 Pa. 70, 327 A.2d 19 (1974); *United States v. Nelson,* 459 F.2d 884 (6th Cir. 1972). See also *United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J., joined by Burger, C. J., Blackmun & Rehnquist, JJ., concurring and dissenting in part). Here, the warrant was obtained in part on the basis of the seizure at the Shaw residence of five persons, an expended shotgun shell found in appellant's pocket, and the statement of the Shaw children. This information would not have been available to the police if it were not for the unconstitutional

search and unlawful arrest, and therefore may not be considered in assessing whether probable cause existed. *Commonwealth v. Knowles, supra; United States v. Nelson, supra.*[8]

■ We find that the remaining information relevant to the likelihood of finding evidence of crime in the Shaw residence—the robbers' purported association with Donald Shaw—provides insufficient probable cause for the issuance of the search warrant. Accordingly, the shotgun and the shotgun shells seized pursuant to the warrant issued on less than probable cause must also be suppressed. This evidence, along with the expended shotgun shell, was an important part of the Commonwealth's case. The admission into evidence of these products of the illegal police activity was prejudicial and therefore requires that we grant appellant a new trial.

Judgments of sentence reversed and a new trial granted.

JONES, former C. J., did not participate in the decision of this case.

POMEROY, J., concurs in the result.

**8.** The Commonwealth has failed to meet its burden of showing that the Shaw children's statement "They took the shotgun into the cellar" was not the product of the illegal police activity. See *Brown v. Illinois,* supra; *Wong Sun v. United States,* supra; *Commonwealth v. Farley,* supra. Nowhere in the suppression hearing record is it established that the statement was made at any time before the police intruded upon appellant's privacy and conducted the unlawful search and arrest. Indeed, the Commonwealth states in its brief that the statement was made after the police came back downstairs. See supra, note 5. The Commonwealth has offered no evidence to establish that the children's statement would have been made even without the illegal police activity and therefore may not be used to support the warrant.