J-S23007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMANE RAYNOR | : | |
| | : | |
| Appellant | : | No. 476 EDA 2021 |

Appeal from the Judgment of Sentence Entered February 9, 2021
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0003342-2019

BEFORE: LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, J.: **FILED AUGUST 18, 2021**

Jamane Raynor appeals from the judgment of sentence, entered in the Court of Common Pleas of Chester County, after a jury convicted him of drug delivery resulting in death,[1] six counts of possession with intent to deliver ("PWID"),[2] dealing in proceeds of unlawful activity,[3] and two counts of criminal conspiracy.[4] After our review, we affirm.

On the morning of July 20, 2019, Nicholas Mincarelli ("Decedent") was found dead by his mother, Kathleen Mincarelli, in the basement of the house

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2506(a).

[2] 35 P.S. § 780-113(a)(30).

[3] 18 Pa.C.S.A. § 5111(a)(1).

[4] 18 Pa.C.S.A. §§ 903 & 5111(a)(1); 35 P.S. § 780-113(a)(30).

Decedent shared with his parents in Phoenixville, Chester County. *See* N.T. Trial, 10/13/20, at 82-84. Decedent had previously been addicted to heroin, but his parents believed he had been clean for four years prior to his death. *Id.* at 78. Decedent had longstanding issues with insomnia; when he was unable to sleep, he would sometimes procure "medicine" from his friend, Jansen Stadelmaier. *Id.* at 86-87. At approximately 10:30 p.m. on July 19, 2019, Decedent's father, Osmond Mincarelli, drove him to Stadelmaier's apartment on Gay Street because "he needed something to get to sleep with." *Id.* at 91-92. Decedent was inside Stadelmaier's apartment for approximately 5 to 10 minutes, after which he and Mr. Mincarelli went home. *Id.* at 92-93.

At approximately 8:40 a.m. on the morning of July 20, Officer Anthony Gray of the Phoenixville Borough Police Department was dispatched to Decedent's residence to attend to a cardiac arrest. *Id.* at 100. When Officer Gray found Decedent, he was "blue in the face, lying on his back, . . . stiff and cold" and had no pulse. *Id.* at 102-03. Based on statements by Mrs. Mincarelli regarding Decedent's past drug use, Officer Gray administered Narcan "as a precaution." *Id.* at 102. Officer Gray subsequently concluded that Decedent was "clearly deceased." *Id.* at 103.

While processing the scene, Officer Gray discovered a clear plastic baggie with a white substance in a nearby trash can. *Id.* at 107. Upon discovering the baggie, Officer Gray began treating the area as a crime scene and questioned Decedent's parents as to "what may [have been] contained in the bag and [whether] they were aware of anything that he might have taken."

- 2 -

*Id.* at 110. Mrs. Mincarelli informed Officer Gray that, when she first discovered Decedent, she had wiped a white substance from his nose. *Id.* Mr. Mincarelli informed Officer Gray that he had taken Decedent to Stadelmaier's apartment the previous night to obtain Xanax, but that he "wasn't sure if that's exactly what he got." *Id.* at 111. Officer Gray testified that he was familiar with Stadelmaier and knew where he lived, and that he was "on . . . the police's radar for possibly . . . dealing drugs." *Id.* at 111, 115. With the Mincarellis' permission, Officer Gray reviewed the caller ID log of their phone and determined that Decedent had called Stadelmaier twice, at 10:11 p.m. and 10:59 p.m., on the night of July 19. *Id.* at 111-12.

Sergeant Bryan McIntyre, also of the Phoenixville Police Department, was assigned to the Bureau of Narcotics Investigations. On July 20, 2019, he was notified by Officer Gray of Mincarelli's overdose death. *Id.* at 124-25. He went to the Mincarelli residence to speak with Decedent's parents and search for drug paraphernalia, which was not found. *Id.* at 126-28. Mr. Mincarelli related to Sergeant McIntyre the previous night's trip to Stadelmaier's apartment; Sergeant McIntyre was familiar with Stadelmaier as a "low level drug dealer." *Id.* at 130.

Sergeant McIntyre subsequently arrested Stadelmaier[5] and took him in for questioning. After waiving his *Miranda* rights, Stadelmaier admitted to

---

[5] Sergeant McIntyre testified that "[w]e were in a unique position where we
*(Footnote Continued Next Page)*

having sold drugs to the Decedent and stated that he received all of his drugs from Raynor. *Id.* at 131-32, 139. Stadelmaier told Sergeant McIntyre that both he and Raynor were present in his apartment when Decedent came to purchase drugs on the night of July 19. *Id.* at 132. Officer McIntyre testified that Stadelmaier told police "that he gave [Decedent] a couple pills and some methamphetamine[, and that] Raynor gave [Decedent] some heroin." *Id.* at 134.

Stadelmaier consented to searches of his cell phone and his residence. The Commonwealth produced pictures of the exterior of Stadelmaier's apartment showing an Arlo[6] video monitoring sticker on the front door of the unit, as well as a sign reading "warning, this area is under 24 hour live/recorded video surveillance." *Id.* at 135. Sergeant McIntyre testified that

---

already had an ongoing investigation going on with Jansen Stadelmaier where we actually had a confidential informant buy from him. So[,] we were actually able to arrest him [for PWID, based on the evidence obtained from the ongoing investigation]. We were able to grab him and physically take him back to our station where we put him in an interview room." *Id.* at 130-31.

[6] Sergeant McIntyre described the Arlo video monitoring system as follows:

It's a small camera that hooks [up] to a network, a home base, that you can plug into your Internet [and] it records on sound and/or motion. You can set it to do either or both. It records in small clips. It might be a 30 second clip here or a two[-] minute[-]long clip here, and then if the motion stops for a second, it will cut off, and as soon as [motion] starts up again, [the recording] will start again.

N.T. Trial, 10/14/20, at 10.

Stadelmaier gave police access to his Arlo camera and its cloud storage account.[7]   N.T. Trial, 10/14/20, at 8.  Video clips from Stadelmaier's home surveillance system were shown to the jury, and Sergeant McIntyre described them for the record.  Specifically, Sergeant McIntyre described Raynor sitting on a couch packaging drugs.  ***Id.*** at 16.  Stadelmaier is seen handing two pills to Decedent, which Decedent immediately ingests.  ***Id.*** at 20.  Raynor could then be heard offering Decedent "dope" and mentioning the word "fentanyl." ***Id.*** at 20-21.[8]

---

[7] Stadelmaier told police that he has an Arlo camera in the corner of his room that records "every second of his life because he is paranoid that his stepfather was trying to poison him."  ***Id.*** at 9.

[8] Sergeant McIntyre described fentanyl as follows:

> Q:  [W]hat generally in your experience . . . do you believe fentanyl to be?
>
> A:  A lot of people feel that fentanyl is stronger than heroin[, ] so they get a better high from it.  Sometimes they search that out, but it's also a lot more dangerous than [] heroin[.]
>
> . . .
>
> Q:  Typically what drugs do you see fentanyl associated with?
>
> A:  Heroin.

***Id.*** at 21.

Thereafter, surveillance video showed Raynor handing Decedent a bag of heroin;[9] in exchange, Decedent placed money on the coffee table in front of the couch where Raynor was sitting.[10] ***Id.*** at 22. Stadelmaier then packaged a bag that Sergeant McIntyre believed to contain methamphetamines and handed it to Decedent. ***Id.*** at 27. Stadelmaier was then heard to say to Decedent "be careful with the dope [(heroin)]." ***Id.*** at 28. Raynor then said "it's strong. It doesn't have fentanyl in it, but it's real strong." ***Id.*** at 29. Sergeant McIntyre testified that Stadelmaier then advised Decedent that "if he feels like he's nodding out or going out, to use some speed, which is—he's referring to the methamphetamine." ***Id.*** at 30.

_____

[9] Sergeant McIntyre testified that it is not possible to tell heroin and fentanyl apart with the naked eye, as they are both "white granular powder." ***Id.*** at 24. Forensic analysis is necessary to differentiate between the two drugs. ***See id.***

[10] Sergeant McIntyre described the conversation between Raynor and Decedent as follows:

> Q: Could you understand what Nicholas Mincarelli was saying there?
>
> A: It sounded like he asked, how much? Ten? And it sounds like Jamane Raynor saying, yeah.
>
> Q: In your experience as a drug detective and a sergeant and head of drug detectives, what do you believe that to mean when he says, how much? Ten?
>
> A: It's the cost of one bag of heroin.

***Id.*** at 23.

Forensic toxicologist Michael Lamb testified that Decedent's blood was found to contain potentially lethal levels of fentanyl, methamphetamine, and morphine (a metabolite of heroin), as well as therapeutic or subtherapeutic levels of alprazolam (Xanax), nordiazepam (Valium), and 7-amioclonazepam (metabolite of Klonopin). *Id.* at 108, 114, 116, 117. Lamb testified as follows:

> Q: [I]t seems like there are several different substances found in [Decedent's] body. In your expert opinion, what substance or substances do you believe to be what I'll call the driving forces in the fatal overdose?
>
> A: The—certainly the fentanyl and the methamphetamine like we discussed. The morphine as it . . . relates to a potential metabolite of heroin, I would say that that's very significant as well. And the level of alprazolam, even though low, can . . . also cause central nervous system depression. However, the nordiazepam and the 7-amioclonazepam can likely be excluded as very contributory based on their very low concentrations.

*Id.* at 121-22.

Forensic Pathologist Khalil Wardak, M.D., of the Philadelphia and Chester County Coroner's Offices, performed the autopsy on Decedent. He determined the cause of death to be drug intoxication—in particular, fentanyl, methamphetamine, amphetamine, alprazolam, and morphine.[11] *Id.* at 189-

---

[11] Doctor Wardak also determined that Decedent suffered from pulmonary edema (fluid in the lungs), most likely caused by fentanyl, *see id.* at 187, cerebral edema (fluid on the brain), indicative of depressants, *see id.*, and urinary retention, also indicative of depressants. *Id.* at 188.

90. Doctor Wardak testified that he believed fentanyl and/or methamphetamine to be the primary cause(s) of death:

Q: Okay. What drugs do you believe were the driving forces, the direct and substantial factors that caused [Decedent] to die?

A: If I take away all the drugs and leave the fentanyl by itself, it can cause death. If I take all the drugs away and just leave methamphetamine, [it] can cause death.

Q: Okay. And obviously the two together, fentanyl and methamphetamine combined, could that cause death?

A: Yes.

*Id.* at 191.

Finally, Phoenixville Borough Police Detective Thomas Hyland testified that the video surveillance evidence from Stadelmaier's apartment showed Raynor either picking up money or dropping off a supply of drugs "almost every day" between July 14 and July 20, 2019. *Id.* at 230.

Police charged Raynor on September 18, 2019, with drug delivery resulting in death, PWID, and related offenses. Thereafter, on October 8, 2019, the Commonwealth filed a 17-count Information; on January 31, 2020, the court appointed current counsel, who filed a motion to suppress the audio and video recordings obtained from Stadelmaier's Arlo video equipment. The court denied that motion on July 1, 2020, after a hearing. On October 7, 2020, the Commonwealth filed notice of its intent to introduce testimony and audio and video evidence of Raynor's prior bad acts pursuant to Pa.R.E. 404(b). Raynor filed a response, and the trial court granted the

Commonwealth's motion immediately prior to the commencement of trial on October 13, 2020.

On October 15, 2020, a jury convicted Raynor of the above-stated charges. The court sentenced him, on February 9, 2021, to an aggregate term of 17½ to 44 years' incarceration. Raynor filed a timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Raynor raises the following claims for our review:

1. Was security camera footage from inside [Stadelmaier's] residence admitted . . . in error because the audio and video recording of [Raynor] was done without his consent, in violation of his expectation of privacy, and in violation of the [Wiretapping and Electronic Surveillance Control Act ("Act")]?[12]

2. Was evidence and testimony regarding [Raynor's] alleged uncharged drug sales admitted in error because they were more unfairly prejudicial than probative, irrelevant, and constituted impermissible prior bad acts [evidence] pursuant to [Rule] 404(b)?

Brief of Appellant, at 9.

Raynor's first claim challenges the court's denial of his motion seeking suppression of the footage from the video security system in Stadelmaier's apartment. Our standard of review of the denial of a motion to suppress evidence is as follows:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining

---

[12] *See* 18 Pa.C.S.A. §§ 5701-5782.

whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on [the] appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [trial court are] subject to plenary review.

***Commonwealth v. Wright***, 224 A.3d 1104, 1108 (Pa. Super. 2019), quoting

***Commonwealth v. Hoppert***, 39 A.3d 358, 361-62 (Pa. Super. 2012).

Raynor argues that the trial court erred in failing to suppress the surveillance video because he did not consent to being recorded and he "had an expectation of privacy in the private residence of another." Brief of Appellant, at 21. Raynor argues that:

Although there was a sign on the outside of [Stadelmaier's apartment] building, there was no signage inside the apartment to notify guests that they were being audio and visually recorded. The front entrance to the building had a sign in the front screen door stating[:] "Video Monitoring in Progress. You may not see Arlo but Arlo sees you." In the window to the left of the front entrance[,] there was a sign stating[:] "Warning This Area Is Under 24 Hour Live/Recorded Video Surveillance." These signs are located on the exterior of the building. There are no signs posted in the interior of the residence. An individual does not have the same expectation of privacy on the outside of a residence as he does inside a residence.

***Id.***

Raynor asserts that his actions and words, as recorded on the surveillance system, are "oral communications" that were "intercepted" by Stadelmaier and that no exception under the Act applies. *Id.* at 23. Accordingly, Raynor asserts the trial court erred in finding the audio and video recordings to be admissible. He is entitled to no relief.

The Act provides, in relevant part, as follows:

(a)    Disclosure in evidence generally.—

(1) . . . [N]o person shall disclose the contents of any wire, electronic or oral communication, or evidence derived therefrom, in any proceeding in any court, board or agency of this Commonwealth.

. . .

(b) Motion to exclude.—Any aggrieved person who is a party to any proceeding in any court, board or agency of this Commonwealth may move to exclude the contents of any wire, electronic or oral communication, or evidence derived therefrom[.]

18 Pa.C.S.A. § 5721.1(a)(1), (b).

An "aggrieved person" is defined as "[a] person who was a party to any intercepted wire, electronic or oral communication or a person against whom the interception was directed." 18 Pa.C.S.A. § 5702. An "intercept" is defined as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." *Id.* "Oral communication" is defined as "[a]ny oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation." *Id.*

- 11 -

"[T]he Act requires that a person uttering an oral communication, as that term is defined under the Act, must have a specific expectation that the contents of a discussion will not be electronically recorded. However, this expectation must be justifiable under the existing circumstances." *Commonwealth v. Brion*, 652 A.2d 287, 288 (Pa. 1994). "Implicit in any discussion of an expectation that a communication will not be recorded, is a discussion of the right to privacy." *Id.*

> To determine whether one's activities fall within the right of privacy, we must examine: first, whether Appellant has exhibited an expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable.

*Id.* at 288-89, quoting *Commonwealth v. Blystone*, 549 A.2d 81, 87 (Pa. 1988).

In *Brion*, our Supreme Court affirmed the suppression of an intercept obtained from a confidential informant, wearing a non-judicially-authorized consensual body wire, who was sent by police into the home of the defendant to purchase marijuana. In doing so, the Court stated:

> If nowhere else, an individual must feel secure in his ability to hold a private conversation within the four walls of his home. For the right to privacy to mean anything, it must guarantee privacy to an individual in his own home. As then-Justice Roberts stated in *Commonwealth v. Shaw*, [] 383 A.2d 496, 499 ([Pa.] 1978): "Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society."

*Brion*, 652 A.2d at 289.

- 12 -

However, this Court subsequently held, in ***Commonwealth v. Mechalski***, 707 A.2d 528 (Pa. Super. 1998), that ***Brion***'s protection does not extend to a visitor to a residence where a non-warrant interception is occurring.  The Court reasoned:

> ***Brion*** does not require suppression of all electronic interceptions taking place in any home; [rather,] it requires suppression of electronic interceptions taking place **in the subject's home**, a place where the subject can reasonably and legitimately "expect the highest degree of privacy known to our society." [***Brion***], 652 A.2d at 289.  One does not reasonably and legitimately expect that highest degree of privacy simply because one enters a house, whether it be the house of a best friend or that of a stranger.  The expectation is only reasonable and legitimate when one enters one's own house.

***Mechalski***, 707 A.2d at 530 (emphasis added).

More recently, in ***Commonwealth v. Mason***, 247 A.3d 1070 (Pa. 2021), the Supreme Court held that an in-home nanny "does not have a justifiable expectation that her oral communications will not be intercepted in the bedroom of a child in her care simply because the nanny is an employee and guest of the homeowner." ***Id.*** at 1082.

Similarly, here, Raynor was not "within the four walls of his home" when his communications were intercepted.  ***Brion***, 652 A.2d at 289.  Rather, he was present as a guest in Stadelmaier's apartment.  As such, he possessed no legitimate or reasonable expectation of privacy such that his oral communications would be protected under the Act.  ***See Mechalski***, ***supra***; ***Mason***, ***supra***.  Indeed, evidence at the suppression hearing demonstrated that Raynor was fully aware of the presence of the video surveillance camera

- 13 -

in Stadelmaier's residence, yet continued to engage in illicit activities on the premises. Stickers on the apartment's front door indicated that video monitoring was in progress and that the property was under 24-hour surveillance. *See* N.T. Suppression Hearing, 6/8/20, at 16-17. Earlier on the day of June 19, 2020, video captured by the surveillance camera shows Raynor asking Stadelmaier to turn the camera off. *See id.* at 22. Stadelmaier responded that the camera was "on." *Id.* Raynor remained on the premises and, in fact, returned later that day, at which time he sold Decedent the fatal narcotics.

Because Raynor possessed no reasonable and legitimate expectation of privacy in the home of another, the court properly denied his motion to suppress the video surveillance evidence from Stadelmaier's apartment.

Raynor next asserts that the trial court erred by granting the Commonwealth's motion *in limine*, seeking to admit testimony, as well as audio and video evidence, of drug sales by Raynor that occurred between July 14, 2020 and July 20, 2020. The Commonwealth sought to admit this evidence to demonstrate opportunity, intent, plan, and lack of accident pursuant to Rule 404(b)(2). Raynor argues that the trial court admitted the evidence in error because it was more unfairly prejudicial than probative,

irrelevant, and constituted impermissible prior bad acts evidence pursuant to Rule 404(b)(1).[13]  He is entitled to no relief.

Our standard of review of evidentiary rulings is well-settled.  Appellate courts review evidentiary decisions for an abuse of discretion. ***Commonwealth v. Jacoby***, 170 A.3d 1065, 1090 (Pa. 2017).  "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused."  ***Id.*** (citation omitted).

All evidence that has a tendency to make a fact more or less probable is admissible, except as provided for by law.  ***See*** Pa.R.E. 401, 402.  Evidence of a crime, wrong, or other act is not admissible to prove the character of a person in order to prove he acted in conformity with a pertinent character trait.  Pa.R.E. 404(b)(1).  However, evidence of other crimes, wrongs, or acts is admissible for other purposes, such as proving motive, opportunity, intent,

---

[13] In the argument section of his brief, Raynor also challenges the admission of the Rule 404(b) prior bad acts evidence on the basis that the Commonwealth's notice of intent to introduce the evidence was "insufficiently vague" and lacked specificity.  ***See*** Brief of Appellant, at 25.  However, in his Rule 1925(b) statement and the statement of questions involved contained in his brief, Raynor frames his challenge to the Rule 404(b) evidence solely in terms of unfair prejudice and relevancy.  Because Raynor did not include a specific claim regarding alleged defects in the Commonwealth's notice of intent in his Rule 1925(b) statement or statement of questions presented, it is waived.  ***See*** Pa.R.A.P.1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) s]tatement . . . are waived"); Pa.R.A.P. 2116 ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

preparation, plan, knowledge, identity, absence of mistake, or lack of accident if the probative value outweighs the potential for unfair prejudice. **See** Pa.R.E. 404(b)(2).

For a bad act to be admissible to prove motive or intent, "there must be a specific logical connection between the other act and the crime at issue [that] establishes that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." ***Commonwealth v. Ross***, 57 A.3d 85, 100 (Pa. Super. 2012) (citation and quotation marks omitted). Mere similarities between the prior bad acts and the crime the defendant is alleged to have committed do not establish motive. ***Id.*** 101.

In addition, evidence of other crimes or bad acts may be admissible to furnish the context or complete story of the events surrounding a crime. **See** ***Commonwealth v. Lark***, 543 A.2d 491, 497 (Pa. 1988). This special circumstance, referred to as the "*res gestae*" exception, provides that evidence of other criminal acts is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." ***Id.*** (citations omitted).

Finally, evidence of prior crimes is admissible where the probative value of the evidence outweighs its potential for unfair prejudice. **See** Pa.R.E. 404(b)(2). "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing

the evidence impartially." ***Commonwealth v. Tyson***, 119 A.3d 353, 360 (Pa. Super. 2015) (citation and quotation marks omitted).

Here, the portion of Raynor's argument dedicated to this claim consists merely of boilerplate citations to the Rules of Evidence and bald, unsupported allegations of unfair prejudice and lack of relevancy. He neither references testimony or evidence contained in the certified record, nor provides citation to relevant authority in support of specific claims. "It is [an a]ppellant's obligation to sufficiently develop arguments in his brief by applying the relevant law to the facts of the case, persuade this Court that there were errors below, and convince us relief is due because of those errors. If an appellant does not do so, we may find the argument waived." ***Commonwealth v. Gibbs***, 981 A.2d 274, 284 (Pa. Super. 2009). As Raynor has not developed his claim in a manner that allows for meaningful review by this Court, we find the argument waived.

Even if we were to address this claim, we would concur with the trial court that the evidence was properly admitted to demonstrate both intent and to provide the "complete story" of the crimes. The court addressed Raynor's claim as follows:

> [Raynor] was charged with [four] counts of [PWID,] including methamphetamine, fentanyl, cocaine, and heroin, the same drugs found in Jansen Stadelmaier's apartment on July 20, 2019. In order to find [Raynor] guilty [of that crime], the Commonwealth must prove, beyond a reasonable doubt, that [he] possessed [] controlled substances with the intent to deliver them to another. [***See***] 35 P.S. § 780-113(a)(30). The video evidence admitted at trial shows [Raynor] going to [] Stadelmaier's apartment . . . between July 15, 2019 and July 19, 2019, and dropping off

controlled substances including heroin, fentanyl, methamphetamine, and cocaine. One video clip shows [Raynor] removing drugs from his crotch. Other video clips show [Raynor] putting drugs on a table and repackaging them for resale. [Raynor] is [also] seen collecting money from [] Stadelmaier and other individuals in exchange for the drugs he repackaged.

The video evidence is [also] admissible to "complete the story" of events surrounding the crime. The video evidence is necessary to establish [Raynor's] presence in [] Stadelmaier's apartment on July 19, 2019. The fact that [Raynor] was at [] Stadelmaier's apartment almost daily prior to July 19, 2019 with drugs, repackaging them for resale, is part of the history of the case. Th[e] video evidence forms part of the natural development of the facts leading to the fatal sale of drugs to [Decedent, who] was found to have overdosed on fentanyl and methamphetamine, the same drugs found in the apartment on July 20, 2019.

. . .

This relevant video evidence is [further] admissible to establish [Raynor] was involved in an ongoing criminal conspiracy. In order to find [Raynor] guilty of conspiracy, the Commonwealth must prove, beyond a reasonable doubt, that [he] agreed with another to engage in conduct constituting a crime and agreed to aid another in the planning and commission of a crime[—]in this case, [PWID]. [*See*] 18 Pa.C.S.A. § 903(a)(1), (2). The video evidence of [Raynor's] prior drug sales in [] Stadelmaier's apartment establishes a chain of events and a course of criminal conduct demonstrating [Raynor's] presence in [] Stadelmaier's apartment for the purpose of selling drugs. The video evidence [also] supports the credibility of [] Stadelmaier's testimony that [Raynor] supplied the drugs that were being sold, directly conflicting with [Raynor's] testimony that he was only there to purchase drugs from [] Stadelmaier for his own personal use and was there as [] Stadelmaier's friend. Th[e] video evidence is relevant to establish that [Raynor] conspired with [] Stadelmaier to promote and facilitate the sale of controlled substances to others.

Finally, th[e] evidence is not so prejudicial as to divert the jury's attention from impartially weighing the evidence. Th[e] video evidence is not prohibited merely because it is harmful to [Raynor] and shows him in a bad light. Th[e] evidence [wa]s not admi[tted] solely to show that[,] because [Raynor] has a propensity to commit crimes, he is more likely to have committed the crimes

- 18 -

charged herein. As we have previously stated, the video evidence is relevant to prove intent as well as establish a conspiracy. The [c]ourt is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form a part of the history and natural development of the event and offenses for which the defendant is charged." **Lark**[], 543 A.2d at 501.

Trial Court Opinion, 3/23/21, at 5-7.

Because the trial court properly admitted the evidence to demonstrate Raynor's intent and to "complete the story" of the crimes, and the evidence was more probative than prejudicial, Raynor's claim is meritless.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2021