Albert LAMPKINS, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 12151.

District of Columbia Court of Appeals.

Argued July 18, 1978.

Decided April 25, 1979.

Lois R. Goodman, Washington, D. C., appointed by this court, for appellant.

Wayne P. Williams, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Sil-

bert, U. S. Atty., John A. Terry, Peter E. George and Judith Hetherton, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and GALLAGHER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

After a jury trial, appellant was convicted of robbery[1] and possession of implements of a crime.[2] He challenges his conviction on three grounds: (1) an expert witness was erroneously permitted to state his opinion that the testimony in this case established a case of robbery by pickpocket; (2) a proper cautionary instruction on the use of expert testimony was omitted; and (3) the evidence was insufficient to convict him of robbery.

On May 31, 1976, Johnny Burgess was traveling on a Trailways bus from New York City to Petersburg, Virginia. At approximately 5 a. m., the bus made a temporary stop at the Trailways terminal in the District of Columbia. Before the bus stopped, Burgess took his bus ticket out of his wallet, put the ticket in his coat pocket, and returned the wallet, which contained two one-dollar bills, to his rear pants pocket. He decided to remain on the bus during the thirty-minute rest stop. While seated inside the bus, he noticed two individuals approach the bus, look inside and then disappear. Shortly thereafter, the bus driver left the bus. The same two men Burgess had previously noticed then boarded the bus and took two rear seats. Moments later, one of the individuals, later identified as appellant, got up and began walking down the aisle toward the front of the bus. As appellant passed Burgess' seat, he dropped several coins. Burgess offered to assist him in locating the coins, but appellant refused Burgess' help and asked him to come out into the aisle while he looked for the coins. He then began to shake the cuffs of Bur-

gess' trousers. When Burgess told him he would get the money out of the cuffs, appellant told him "no, he did not want Burgess to wrinkle his pants." At the same time, the other individual who had entered the bus with appellant walked toward Mr. Burgess and bumped him so hard he nearly fell back into his seat. At that point, appellant stood up and stated, "That's all right, forget it." The two men walked down the aisle and left the bus. The individual who had bumped Burgess was carrying a wrapped package two to three feet in length.

The bus driver returned to the bus and asked Burgess what had happened. After Burgess related the incident, the driver asked him if he had his wallet. Burgess reached into his pocket and found his wallet missing. The driver ran to the terminal and notified a security guard what had happened. The officer pursued the two individuals, eventually catching appellant in a nearby alley. After a brief scuffle with the officer, he was brought back to the terminal and identified by Burgess as the one who had dropped the change.[3] A search of appellant resulted in the recovery of two one-dollar bills, a needle and syringe.

At trial, Sergeant Robert Eldridge, a thirty-five year veteran of the police department, was qualified as an expert in the investigation of confidence schemes and pickpocket offenses. Prior to his testimony, the prosecutor announced she would elicit from Sergeant Eldridge not only his description of the modus operandi of pickpockets in general, but also his opinion as to the significance of appellant's dropping coins in this case. Over defense objection, the court ruled the opinion admissible.

Sergeant Eldridge described in detail the techniques of pickpockets working in pairs. He testified that one person usually acts as a "stall" with the duty of distracting the victim while the other party, the "dip," extracts the proceeds from a pocket or bag.

1. D.C.Code 1973, § 22-2901.

2. D.C.Code 1973, § 22-3601.

3. At trial, some seven months later, Burgess was able to say only that appellant "looked like" the man who dropped the coins.

He stated that in order to distract a victim, "[the stall] may drop coins and things of that nature." One of the pair generally carries an object to conceal the activity of the hand while the pickpocket is working. As soon as the "dip" recovers the wallet or money, he immediately turns it over to the "stall" to avoid being caught with the stolen goods if questioned. The pickpockets' activities generally are centered in congested areas. After he completed his testimony on the modus operandi of pickpockets, Sergeant Eldridge was asked:

> Q. Now, Sergeant Eldridge, you were present in court during the testimony of Mr. Burgess in this case—
>
> A. Yes.
>
> Q.—is that correct? *You heard his testimony?*
>
> A. I did.
>
> Q. *And based upon what you heard,* do you have an opinion as to the significance of the dropping of the change as Mr. Burgess related it?
>
> A. Yes.
>
> Ladies and gentlemen, it is my firm opinion that *this is a classic case of a team effort* in which the dropping of the coins was specifically to distract the gentleman and even after the dropping of the coins, the distraction, the verbal statement of so forth and, "Will you do this," to get the man in a position in which the dip could make the extraction in a more—in a better way. There is no question in my mind that *this was a classic team effort.* [Emphasis added.]

Following Sergeant Eldridge's testimony, the court read the standard instruction to the jury on the use of expert testimony.[4]

> An expert in a particular field is permitted to give his opinion in evidence. You are not bound by the opinion of such an expert. You should consider his testimony in connection with the other evidence in the case and give it such weight as, in your judgment, it is fairly entitled to receive.

The defense moved for a mistrial after Sergeant Eldridge's testimony on the grounds that the expert had improperly given his opinion of the case. The motion was denied by the court.

Appellant did not testify in his own behalf, but presented an investigator who testified that shortly before trial, she called Burgess who told her he did not make an identification of appellant to the police at the terminal.

We note initially that Sergeant Eldridge's expert qualifications are undisputed. Nor is the admissibility of his testimony regarding the modus operandi of pickpockets challenged. In holding admissible testimony by a police expert concerning the techniques of pickpockets working in pairs, this court recently stated, "it is well-settled that expert testimony may be employed so that the jury can appreciate the possible relationship between seemingly innocent acts." *Hooks v. United States,* D.C.App., 373 A.2d 909, 911 (1977). We are well aware that "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer' "; for that reason the testimony of experienced officers may aid laymen in understanding the techniques employed by pickpockets, and other criminals. *United States v. Jackson,* 138 U.S.App.D.C. 143, 145, 425 F.2d 574, 576 (1970), quoting from *Davis v. United States,* 133 U.S.App.D.C. 172, 174, 409 F.2d 458, 460, *cert. denied,* 395 U.S. 949, 89 S.Ct. 2032, 23 L.Ed.2d 469 (1969).

Appellant contends, however, that Sergeant Eldridge's testimony went beyond

---

4. See District of Columbia Bar Ass'n, Criminal Jury Instructions for the District of Columbia No. 1.05 (2d ed. 1972). Defense counsel had requested that the following cautionary instruction be read to the jury *before* Sergeant Eldridge testified:

> Ladies and gentlemen, the court will instruct you later with respect to what weight you should give to the testimony of the so-called expert. You should understand, however, that this testimony by this officer was not testimony that relates to or purports to describe the conduct of either of these defendants. This is general testimony as to the techniques and has nothing to do with what either of these defendants actually did. That will have to be established by other witnesses.

helpful background information when he offered his "firm opinion" that defendant's activities were part of a "classic team effort." The proffered· opinion, he also asserts, exceeded the proper scope of expert testimony by going to the ultimate issue in the case: whether defendant committed robbery by pickpocket. We agree with appellant that admission of Sergeant Eldridge's opinion implicating appellant in a pickpocket scheme was reversible error.[5]

 It is a long established rule in this jurisdiction that an expert may not state his opinion where the jury is capable of drawing its own conclusions from the evidence. *See, e. g., St. Lewis v. Firestone,* D.C.Mun.App., 130 A.2d 317 (1957); *Woolard v. District of Columbia,* D.C.Mun.App., 62 A.2d 640 (1948); *Henkel v. Varner,* 78 U.S.App.D.C. 197, 138 F.2d 934 (1943). Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates. *Waggaman v. Forstmann,* D.C.App., 217 A.2d 310, 311 (1966). Expert testimony, by definition, must ordinarily relate to some matter "beyond the ken of the average layman," because its function is to aid the trier of fact. *See, e. g.,* McCormick, Evidence § 13 at 29–30 (1972); *Waggaman, supra* at 311. Once witnesses have qualified as experts, they may testify in the form of opinions, but only to the extent necessary to aid the trier of fact.[6]

 The jury was as competent as the expert, in this case, to conclude that defendant's activities were or were not consistent with the modus operandi of pickpockets as described by Sergeant Eldridge. The expert opinion here under attack was of no real aid to the jury in reaching a correct conclusion. Where in "light of the facts, anyone of ordinary training and intelligence would be equally capable of an opinion," admission of the expert opinion, "invade[s] the province of the trier of the facts," and is, therefore, improper. *St. Lewis v. Firestone, supra* at 319.

We believe this case is distinguishable from those situations where the value of the expert's testimony lies in drawing conclusions or inferences from the facts. It is the application of skilled training and knowledge to the facts that aids the jury, particularly where the jurors are unfamiliar with technical jargon or concepts. *See, e. g., Riley v. United States,* 96 U.S.App.D.C. 258, 225 F.2d 558 (1955) (coroner permitted to express an opinion, on the basis of an autopsy performed, whether defendant could have inflicted the wound in manner she claimed because opinion required knowledge of human anatomy and of the character of wounds and their effect on bodily tissue); *Ohio Valley Construction Co. v. Dew,* D.C.App., 354 A.2d 518 (1976) (admission of expert testimony concerning automobile braking and sighting distances not abuse of discretion because involving mathematical computations and knowledge of physics).[7] Additionally, this is not a case where the expert witness had means of observation and of forming an opinion superior to that of the jury who must rely on reproduction of the circumstances in court. *See, e. g., Woolard v. District of Columbia, supra* (police officers permitted to give opinion based on personal observations as to whether driver was intoxicated). Sergeant Eldridge based his opinion, like the jurors, on evidence introduced at trial.

---

**5.** Because the admission of Sergeant Eldridge's opinion requires reversal, we have no need to reach the instruction issue. We reject appellant's challenge to the sufficiency of the evidence.

**6.** The federal rules of evidence, even though broadening the admissibility of opinion testimony, found it "wise to recognize that opinions are not indispensable and to *encourage the use of expert testimony in nonopinion form when counsel believes the trier can itself draw the requisite inference.*" Advisory Committee Note, Fed.R.Evid. 702, 56 F.R.D. 183, 282 (1973) (emphasis added).

**7.** Thus, we disagree with the trial judge in this case who saw no distinction between a medical opinion as to causation of an injury (*e. g.,* that the skull fracture of a child was caused by excessive force, supplied by throwing or thrusting) and the police expert's opinion that defendant's behavior was part of a team pickpocket operation.

At trial, defendant objected to the expert opinion testimony as going to the ultimate issue in the case: whether defendant was guilty of robbery by pickpocket. The government urges on appeal that the question at trial did not elicit an opinion on the ultimate issue of whether the crime of robbery occurred, but only as to the significance of the dropping of the change. In our view, Sergeant Eldridge's opinion concerned the ultimate issue in the case, even if he did not expressly certify the guilt of defendant. To characterize the testimony as other than an opinion on whether defendant should be found guilty would be unsophisticated.[8]

In a federal case, virtually indistinguishable from the case under review, the District of Columbia Circuit Court found objectionable the conclusive opinion of a vice squad detective that the evidence " 'fitted right into [his] knowledge of how numbers men operated.' " *Simmons v. United States*, 92 U.S.App.D.C. 122, 123, 206 F.2d 427, 429 (1953). This testimony, the court held, prejudiced defendant by substantially affecting his right to trial by jury. As the court stated:

> Such opinion evidence trenched upon the jury's duty to determine the ultimate question raised by count one, i. e., whether appellant was operating a numbers game in violation of 22 D.C.Code § 1501. *It was for the jury, not for the witnesses, to measure evidence on appellant's con-*

*duct against evidence on the pattern of conduct characteristic of a numbers operator* and upon that basis to determine guilt or innocence. [*Id.* at 124, 206 F.2d at 430; emphasis added.]

■■ In recent years, courts in this jurisdiction have relaxed the ultimate facts rule, holding that an expert may state a conclusion on such facts provided the conclusion is one that laymen could not draw. Thus, expert opinion testimony will not be excluded merely because it amounts to an opinion upon ultimate facts. *See, e. g., Casbarian v. District of Columbia*, D.C.Mun. App., 134 A.2d 488, 491 (1957) ("The real test is not that the expert opinion testimony would go to the very issue to be decided by the trier of fact, but whether the special knowledge or experience of the expert would aid the court or jury in determining the questions in issue"). As a practical matter, an exception to the ultimate issue rule exists where the helpfulness of the proffered expert opinion outweighs its prejudicial impact; to the extent admission is necessary to aid the jury, an invasion of the jury's province will be tolerated. Nevertheless, we find objectionable questions which, in effect, submit the whole case to an expert witness for decision.[9]

■■ Given the impact of the police officer's testimony on this particular record, it would be difficult to find admission of the opinion harmless.[10] Error will be deemed

---

**8.** For this reason, we do not find persuasive the state cases cited by the government. *See, e. g., People v. Hardy*, 271 Cal.App.2d 322, 76 Cal. Rptr. 557 (1969); *People v. Clay*, 227 Cal. App.2d 87, 38 Cal.Rptr. 431 (1964); *State v. Johnson*, 224 N.W.2d 617 (Iowa 1974). In the cases cited, it seems to us, strained distinctions are made between statements as to guilt or innocence and an opinion that defendant's conduct is consistent with a described modus operandi.

**9.** This approach is consistent with the federal rules of evidence. Fed.R.Evid. 403 provides for the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Although Fed.R.Evid. 704 abolishes the ultimate issue rule, the Advisory Committee's Note makes clear that Rule 704 "does not lower the bars so as to admit all

opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria." Advisory Committee Note, Fed.R.Evid. 704, 56 F.R.D. 183, 285 (1973).

**10.** *Compare United States v. Johnson*, 174 U.S. App.D.C. 72, 527 F.2d 1381 (1976) (the prejudicial impact of expert testimony concerning the habits of narcotics users and dealers was less because the police detective did not state an opinion as to whether appellant was a dealer, but only as to whether a person with a speci-

harmless only if, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," we can say "that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 764 65, 776, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), quoted in *Campbell v. United States,* D.C.App., 391 A.2d 283, 288 (1978). Realistically, the expert opinion did not aid the jury. On the other hand, the prejudicial impact of the opinion was great. This situation raises the danger that a jury might forego independent analysis of the facts and bow too readily to the opinion of an expert. We conclude that the trial court committed reversible error in permitting the opinion testimony.

*Reversed and remanded for a new trial.*

fied amount of drugs on his person was likely to be a dealer. In addition, defendant was acquitted of possessing narcotics for distribution.)