**Ondrae GANT, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 84–1495.

District of Columbia Court of Appeals.

Argued May 15, 1986.
Decided Nov. 20, 1986.

Christopher Stone, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., were on the brief,. for appellee.

Before PRYOR, Chief Judge, and BELSON and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant Ondrae Gant was convicted by a jury of rape, D.C. Code § 22–2801 (1981), carnal knowledge, *id.*, and enticing a minor child, *id.*, § 22–3501(b). A new trial was granted based on the prosecutor's improper impeachment of Gant. Gant then moved to dismiss the indictment because of prosecutorial vindictiveness and double jeopardy. The motion was denied, and Gant appealed; this court affirmed the denial on double jeopardy grounds, but deferred, as premature, a decision on the issue of prosecutorial vindictiveness. *Gant v. United States*, 467 A.2d 968 (D.C.1983), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984). At a second jury trial Gant again was convicted of rape, carnal knowledge and enticing a minor child. On appeal he assigns as error the denial of (1) the motion to suppress the clothes, shavings and razor seized from his home after a warrantless search; (2) the motion to strike expert medical testimony that the sexual intercourse between himself and the complainant had been forced rather than consenting; and (3) the motion to dismiss the indictment to sanction the prosecutorial misconduct during and after the first trial.

Upon review of the record we hold: First, the motion to suppress the clothes,

hairs and razor should have been granted because the record does not support either the exigent circumstances or plain view exceptions to the warrant requirement of the Fourth Amendment. However, because the physical evidence was relevant only to a collateral issue, the error was harmless beyond a reasonable doubt. Second, the motion to strike expert testimony was untimely since defense counsel elicited the expert's testimony on cross-examination and did not move to strike it until two other witnesses had testified. Therefore, any objection to the testimony was waived. Notwithstanding that the expert testimony intruded on the jury's function to determine the ultimate issue, the tactical decision by experienced defense counsel, to attack that testimony through cross-examination and presentation of a defense expert with a contrary opinion, precludes a finding of plain error. Third, the denial of the motion to dismiss the indictment was within the range of permissible decisions by the trial court in the reasoned exercise of its discretion. The new trial provided an appropriate remedy and Gant can point to no residual prejudice. Accordingly, we affirm the judgment of conviction.

## I.

The evidence presented by the government showed that Gant forced the twelve-year-old, pre-pubescent female complainant into his car on the morning of September 22, 1981, and drove to a nearby playground while holding her hand. He then ordered her into the back seat. When the frightened complainant protested and cried, Gant gave her the impression he would pull out a knife if she refused. Once in the back seat, the complainant tried to escape through the door, but Gant choked her with both hands and told her to "cooperate." Then he pulled off her underwear and his pants, and inserted his penis into her vagina. The sexual intercourse was quite pain-ful to the complainant, and by the time Gant finished, she was bleeding from her vaginal area. Gant told her to wipe herself with notebook paper. He wiped himself as well, threw the paper out the car window and returned to the front seat.[1] James Harrston, an off-duty police officer, who was wearing a cap with police insignia, approached the car to complain about Gant's littering. The complainant saw Harrston for a moment, but at Gant's instruction, crouched down in the back seat, and Gant drove off at high speed. Harrston did not see or hear the complainant, but identified Gant in a line-up as the driver of the car.

Gant let the complainant out of the car several blocks from her home. Upon arriving home, she immediately told her mother she had been raped; her mother called the police. Detective Clark took the complainant to Children's Hospital where she was examined by a pediatric resident, Dr. Sibyl Wescoe. Dr. Wescoe found the complainant somewhat restless, withdrawn and apprehensive, and in constant need of her mother. The physical examination revealed nothing abnormal, but during the gynecological examination Dr. Wescoe found a two millimeter tear in the complainant's hymen, which was "particularly" black and blue and swollen. The opening to the complainant's vagina and her labia also were red, bruised, swollen and tender. A routine laboratory test confirmed the presence of sperm in her vagina. In Dr. Wescoe's opinion, based on her physical and gynecological examinations, the recent sexual intercourse experienced by the complainant had been forced rather than consenting.

The defense conceded Gant's factual guilt of carnal knowledge and did not present a defense to the charge of enticing a minor child. Thus, the only issue at trial was whether the sexual intercourse had been against the complainant's will.[2]

---

1. Gant's fingerprints were found on notebook paper recovered from the playground.

2. Had Gant been acquitted of rape, he intended to raise an insanity defense to carnal knowledge.

Gant's defense to rape was that the complainant had consented to have sexual intercourse with him, then regretted her decision and cried "rape." Gant did not testify or offer affirmative evidence of the complainant's consent. Instead, he elicited through cross-examination inconsistencies in the testimony of government witnesses (principally the complainant and her mother), and presented two witnesses who disputed the complainant's testimony that she previously had not known Gant and that on the day of the alleged rape she had been unable to enter her school building because the door was locked. The defense also challenged Dr. Wescoe's opinion through cross-examination and presented a medical expert who testified that it was impossible to tell from the medical records whether the sexual intercourse had been forced or consenting.

## II.

*The Motion to Suppress.* Gant contends that following the entry of his house by the police to arrest him,[3] the police conducted a general search for evidence under circumstances which did not fall within the exceptions to the warrant requirement of the Fourth Amendment for evidence in plain view or exigent circumstances.[4] The complainant saw Gant at an ice cream truck near her home six days after he had sexual intercourse with her, and ran home to tell her mother and sister. All three watched Gant walk across the street, run through a parking lot, jump a fence and enter a house

at 224 50th Street, N.E. They called the police, who arrived minutes later. The police knocked at the door of 224 50th Street, announcing their presence for about 20 minutes, but no one answered. After the arrival of a canine unit, the police entered the house and found Gant in a second floor bedroom where he was immediately arrested. At the time Gant was freshly shaven and in his underwear, although the man at the ice cream truck had been described as having facial hair and wearing a blue knit shirt and blue jeans. The arresting officers discovered, and the mobile crime unit subsequently seized, a razor with hair particles from a bathroom down the hall and clothing matching the description from another bedroom.

Warrantless searches of a residence are presumed unreasonable unless they fall within carefully delineated exceptions. *Thompson v. Louisiana,* 469 U.S. 17, 18, 105 S.Ct. 409–410, 83 L.Ed.2d 246 (1984); *see Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). Exigent circumstances justifying a warrantless entry and search include "the need to protect or preserve life or avoid serious injury,"[5] the need to prevent the escape of a suspected criminal,[6] and the need to preserve evidence which may be destroyed, either through deliberate action[7] or natural forces.[8] Even so, "a warrantless search must be strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona, supra* note 5, 437 U.S. at

**3.** Gant does not contest Judge Revercomb's ruling that the warrantless entry of the house by the police to arrest him was justified by exigent circumstances surrounding the entry. *United States v. Minick,* 455 A.2d 874 (D.C.), *cert. denied,* 464 U.S. 831, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983); *Brooks v. United States,* 367 A.2d 1297 (D.C.1976); *Dorman v. United States,* 140 U.S. App.D.C. 313, 435 F.2d 385 (1970) (en banc).

**4.** The government did not argue that the searches and seizures were incident to a lawful arrest. *See Brooks, supra* note 3, 367 A.2d at 1304 n. 6.

**5.** *Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978)

(quoting *Wayne v. United States,* 115 U.S. App. D.C. 234, 241, 318 F.2d 205, 212 (1963)).

**6.** *See Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *Brooks, supra* note 3, 367 A.2d at 1303; *Dorman, supra* note 3, 140 U.S. App. D.C. at 319; 435 F.2d at 391.

**7.** *See Minick, supra* note 3, 455 A.2d at 881; *Brooks, supra* note 3, 367 A.2d at 1303.

**8.** *See Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966).

393, 98 S.Ct. at 2413 (quoting *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882–1883, 20 L.Ed.2d 889 (1968)). This court determines whether exigent circumstances existed by examining the facts perceived by the police at the time of entry or the initiation of the search. *Derrington v. United States,* 488 A.2d 1314, 1324 (D.C. 1985); *Minick, supra* note 3, 455 A.2d at 881; *Brooks, supra* note 3, 367 A.2d at 1302.

The plain view doctrine also is closely circumscribed. Plain view alone does not "justify the warrantless seizure of evidence." *Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971).[9] Rather, the officers must be lawfully present at the site of the search and seizure, and their discovery of evidence must be inadvertent. *Brooks, supra* note 3, 367 A.2d at 1305 (citing *Coolidge v. New Hampshire, supra,* 403 U.S. at 466, 91 S.Ct. at 2038). It also must be immediately apparent to the officers that they have evidence before them. *Coolidge v. New Hampshire, supra,* 403 U.S. at 466, 91 S.Ct. at 2038; *Christmas v. United States,* 314 A.2d 473, 477 (D.C.1974). The government has the burden to prove that the circumstances of the search and seizure fell within the doctrines of exigency or plain view. *See Brooks, supra* note 3, 367 A.2d at 1308 (citing *Coolidge v. New Hampshire, supra,* 403 U.S. at 455, 464–73, 91 S.Ct. at 2032, 2037–42). We hold it has failed to do so.

Officer Wilson, who discovered Gant's clothing, testified that he was one of several officers who entered the house to arrest Gant. He was looking for a man whom the complainant and her mother had described as "a black male, dark complexion [with] a mustache and goatee, and ... wearing a blue sweater and faded blue jeans." The man Wilson observed in the bedroom was clothed only in a T–shirt and "underwear-type jockey shorts." Although Wilson initially entered the bedroom with the other arresting officers, he stepped back into the hallway because others had Gant under control and he (Wilson) did not want to be bitten by the police dog. Wilson paid little attention to the arrest. Instead, he explained, he was looking around, from his vantage point in the hallway, for the clothing that Gant had been described as wearing less than an hour earlier. In a second bedroom he noticed some clothes balled up on a chair. Because he could not tell if the clothes were those described by the complainant and her mother, he walked into the second bedroom for a closer look. He saw a sweater and a dark blue jacket on the chair. Wilson then looked around the room and saw a pair of jeans on another chair. The jeans had not been visible from the hallway. Without touching anything, Wilson returned to the hallway, and remained in the house until the mobile crime unit arrived; police assigned to that unit seized the clothing.

Officer Downs, another arresting officer, noticed that Gant's chin and the sides of his face were "ashy as if he had just shaved." Downs and another officer immediately went to the bathroom down a hallway where they saw hairs in the sink and a razor lying nearby. They did not touch anything, and the mobile crime unit subsequently seized the shavings and razor.

The court will reverse the trial court's findings of fact only if they are clearly erroneous. *See Minick, supra* note 3, 455 A.2d at 876; *Brooks, supra* note 3, 367 A.2d at 1302. Judge Revercomb found that the clothes were in plain view. He also found that one of the arresting officers had seized the shavings found in the sink, and that the immediate seizure was

9. As the Supreme Court explained:
it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of the seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.
*Id.* at 465, 91 S.Ct. at 2037 (emphasis in original).

necessary to preserve the hairs. Regarding the razor, the judge stated, "the razor is not suppressed. It was within the bathroom."[10] Although the judge's finding about when the hairs were seized was contrary to the officers' testimony that the shavings and razor were seized by the mobile crime unit, it is the time and circumstances of the discovery which are determinative of the propriety of the warrantless seizures, and not when the seizures occur. *Id.* at 1306. Therefore, since the judge did not make supportable findings of fact about the shavings or razor, we must determine whether his refusal to suppress the shavings and razor is supportable under any reasonable view of the evidence, and whether his failure to suppress the clothing was clearly erroneous. *Id.* at 1302, 1304.

■ Viewing the evidence most favorably to the government, *id.* at 1304, the warrantless searches fit within neither the exigency nor plain view, exceptions to the warrant requirement. Exigent circumstances cannot justify the search of the bathroom. Gant was found alone in the house and immediately arrested. Therefore, there was no danger that he would destroy the evidence, and the police could not search for or seize the shavings and razor on that basis. *See Mincey v. Arizona, supra* note 3, 437 U.S. at 392–93, 98 S.Ct. at 2413–14; *Brooks, supra* note 3, 367 A.2d at 1305. Although a fear of imminent destruction by natural forces could justify the search, none of the officers expressed this concern during their testimony before the trial court. *Brooks, supra* note

3, 367 A.2d at 1302 (exigent circumstances doctrine is to be applied as perceived by police officer at time of entry). *Compare Segura v. United States,* 468 U.S. 796, 799, 104 S.Ct. 3380, 3383, 82 L.Ed.2d 599 (1984) (searching premises to preserve status quo while obtaining warrant does not violate Fourth Amendment). Nor did the actions of the police, in waiting for the mobile unit, indicate their belief that "every passing moment jeopardized" the possibility of recovering the evidence. *Minick, supra* note 3, 455 A.2d at 881.

■ Plain view cannot justify seizure of the clothes. Officer Wilson's discovery of the clothing was not inadvertent. He testified that from his position in the hallway he was looking around for the clothing. When the police search with the intention of finding evidence, they may not claim inadvertence.

> [T]o extend the scope of ... an intrusion to the seizure of objects—not contraband nor stolen nor dangerous in themselves— which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure.

*Coolidge v. New Hampshire, supra,* 403 U.S. at 471, 91 S.Ct. at 2041.[11] Officer Wilson testified that his purpose for going into the second bedroom was to gather evidence; he did not enter to assure Gant's apprehension or to check for the presence of others, *see Brooks, supra* note 3, 367 A.2d at 1305 n. 9.[12] Therefore, his subse-

---

**10.** Judge Revercomb suppressed photographs taken by the mobile crime unit on the ground that they were taken after the exigency had passed.

**11.** *See also Brooks, supra* note 3, 367 A.2d at 1307 ("Satisfaction of the inadvertency criterion would require the discovery of the stained bedding and the incriminating clothes to have been a subordinate aspect of the arrest itself, or the result of some justifying purpose other than merely gathering evidence.").

**12.** *See Chimel v. California, supra,* 395 U.S. at 763, 89 S.Ct. at 2040 (Fourth Amendment con-

tinues to protect areas of house where arrest not made); *Adoue v. State,* 408 So.2d 567, 571 (Fla. 1981). *United States v. Bradshaw,* 490 F.2d 1097, 1100 (4th Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) ("officer's presence at the vantage point from which he discovers the evidence in plain view must not amount to an unjustifiable intrusion into an area with respect to which defendant's expectations of privacy are protected by the [F]ourth [A]mendment"), quoted in *Brooks, supra* note 3, 367 A.2d at 1305 n. 8. *See also Morrison v. United States,* 104 U.S. App. D.C. 352, 356, 262 F.2d 449, 453 (1958).

quent discovery of the jeans was an extension of an unreasonable search. In addition, when Wilson initially saw some clothing from the hallway, it was not obvious to him that he had evidence in front of him. *See Coolidge v. New Hampshire, supra,* 403 U.S. at 466, 91 S.Ct. at 2038 ("the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges").

■ Nevertheless, although no reasonable view of the testimony supports the warrantless seizure of the shavings, razor, and clothing, we hold that the admission of the physical evidence could not have had a significant impact on the jury, and that any error was harmless beyond a reasonable doubt.[13] *Chapman v. California,* 386 U.S. 18, 21–24, 87 S.Ct. 824, 826–828, 17 L.Ed.2d 705 (1967). All parties agree that the physical evidence was admitted to show Gant's consciousness of guilt, and not his identity (which Gant admitted) or the complainant's lack of consent, to which consciousness of guilt was only indirectly related.[14] The physical evidence was cumulative of substantial other evidence which showed Gant's consciousness of guilt, including the testimony about his flight from Officer Harrston when he approached the car to complain of Gant's littering; his quick and irregular departure when the complainant and her mother saw him at the ice cream truck; his refusal to open the door to the police; and his attempt to change his appearance by removing his clothing and facial hair between the time he was seen at the ice cream truck and found in his house.

### III.

■ *The motion to strike expert testimony.* Gant contends Judge Smith com-

mitted manifest error in denying the motion to strike Dr. Wescoe's testimony about the amount of pain suffered by the complainant during sexual intercourse with Gant and the doctor's conclusion based on the pain that the intercourse had been forced rather than consenting. His argument is two-fold. First, he argues that Dr. Wescoe's testimony was incompetent because she was not qualified as either an expert in forensic medicine or an expert on the pain threshold of twelve-year-old virgins. The doctor was qualified only to testify as a medical physician, and in the absence of medical findings indicating pain, Gant argues the doctor's testimony was inadmissible and highly prejudicial. Second, and closely related, Gant argues that Dr. Wescoe's testimony impermissibly invaded the province of the jury when the doctor presented her conclusion that the complainant had been forced into sexual intercourse and based that conclusion on what the complaint had told her about the sexual intercourse with Gant. The complainant's testimony was before the jury, and the jury, Gant argues, was as capable as Dr. Wescoe of drawing a conclusion based on this testimony about whether the intercourse was forced or with the complainant's consent.

The decision to admit expert testimony is within the broad discretion of the trial court "and a ruling either admitting or excluding such evidence will not be disturbed unless 'manifestly erroneous.'" *Dyas v. United States,* 376 A.2d 827, 831 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977) (citing *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (which relied on *Spring Co. v. Edgar,* 99 U.S. 645, 9 Otto 645, 25 L.Ed. 487 (1878)).[15]

---

**13.** This court has rejected under comparable circumstances the inevitable seizure justification. *Douglas-Bey v. United States,* 490 A.2d 1137, 1139 n. 6 (D.C.1985).

**14.** Gant could have had ample reason to avoid the police merely on the basis of the carnal knowledge charge.

**15.** The term "manifestly erroneous" refers to our standard of review of the discretion exercised by the trial court. *Dyas, supra,* 376 A.2d at 831; *see also Salem v. United States Lines Co., supra,* 370 U.S. at 35, 82 S.Ct. at 1122; *Spring Co. v. Edgar, supra,* 99 U.S. at 658, 9 Otto at 658. *But see Noaks v. United States,* 486 A.2d 1177, 1179 (D.C.1985) (review is for manifest error or

Accordingly, this court must determine, from the record on appeal, whether the trial court failed to exercise its discretion with reference to all the necessary criteria in admitting or excluding expert testimony.[16] *Ibn–Tama, supra* note 16, 407 A.2d at 635. "Otherwise, the very reason for such deference—*i.e.*, the trial court's opportunity to observe, hear and otherwise evaluate the witness—will be compromised." *Id.* (citing *Johnson v. United States*, 398 A.2d 354, 363–67 (D.C.1979)).

In addition to evaluating the competence of the proffered expert witness, and assuring that the witness' testimony does not exceed the scope of the expert's qualifications approved by the court, the trial court also must prevent an expert witness from preempting the function of the jury. Improper preemption can occur in two ways: when the witness speaks "too directly to the ultimate issue (i.e., guilt or innocence)" or speaks "to matters in which the jury is just as competent as the expert to consider and weight the evidence and draw the necessary conclusions." *Ibn–Tamas, supra* note 16, 407 A.2d at 632 (quoting *Lampkins v. United States*, 401 A.2d 966, 969 (D.C.1979)); *Dyas, supra*, 376 A.2d at 832. The "ultimate facts" rule has been somewhat relaxed in this jurisdiction, and an expert may state a conclusion on such facts so long as the conclusion is one that layper-

sons could not draw. *Ibn–Tamas, supra* note 16, 407 A.2d at 632 n. 13 (citing, *e.g., Casbarian v. District of Columbia*, 134 A.2d 488, 491 (D.C.1957) (the focus is no whether the expert has "special knowledge or experience" which "would aid the court or jury in determining the questions in issue")); *Lampkins, supra*, 401 A.2d at 970 ("an exception to the ultimate issue rule exists where the helpfulness of the proffered expert opinion outweighs its prejudicial impact; to the extent admission is necessary to aid the jury, an invasion of the jury's province will be tolerated"). *See also* ROGERS ON EXPERT TESTIMONY § 219 at 502–03 Benjamin Werne (3d ed. 1941) (expert may not testify whether in his or her opinion the injury was caused by sexual intercourse, or the laceration or swollen condition indicated penetration by rape.).[17] However, before considering the merits of Gant's claim of manifest error, we must determine whether the motion to strike was timely, and if not, whether any objection was waived and our review limited to plain error. *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (plain error is error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial"); *see* WIGMORE ON EVIDENCE § 18, at 796 (Tillers Rev.1983).[18]

serious injustice upon the defendant's failure to renew a motion for judgment of acquittal at close of all the evidence).

**16.** The criteria are set forth in a three-fold test: (1) the subject matter must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average lay [person]* [emphasis added]; (2) the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in [the] search for truth* [emphasis added]; and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.

*Dyas, supra*, 376 A.2d at 832 (quoting McCORMICK ON EVIDENCE § 13 (2d ed. E. Cleary 1972); *see also Ibn-Tamas v. United States*, 407 A.2d 626, 637 (D.C.1979), *appeal after remand*, 455 A.2d 893 (1983) (the scientific principle or

discovery from which the expert deduces an opinion "must be sufficiently established to have gained general acceptance in the particular field in which it belongs") (quoting *Frye v. United States*, 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923)).

**17.** *Brown v. United States*, 409 A.2d 1093, 1096 (D.C.1979), is not to the contrary. Although the medical expert testified that the complainant "was the victim of forced vaginal intercourse," no issue was raised on appeal concerning that testimony.

**18.** According to Professor Wigmore, the contemporaneous objection rule requires that an objection be made as soon as the question is stated and before the answer is given, unless the inadmissibility arises not from the subject of the question but from the nature of the answer. WIGMORE, *supra* at 797. Where the answer is unresponsive to the question, *e.g.*, containing

Gant initially objected to Dr. Wescoe's testimony on direct examination when the prosecutor asked the doctor whether she could conclude, based on her examination of the complainant, that "the recent sexual penetration had been forced." [19] At the bench conference, Judge Smith asked if defense counsel would object to the prosecutor rephrasing the question to ask, "based on her ... gynecological examination alone, can you render an opinion as to whether or not this was forced or consensual [sic]?" Defense counsel replied he could not and would not object to such a question. The question was asked, and Dr. Wescoe replied, "The extent of the trauma suggests that it was forced." Defense counsel did not move to strike the answer, and the prosecutor moved immediately to another area of questioning and shortly thereafter concluded his direct examination.

The first clear indication that Dr. Wescoe was no longer referring to force in terms of the physical force needed to achieve penetration, but was referring to force meaning nonconsenting contact, occurred on crossexamination. Defense counsel asked the doctor whether she could explain her testimony at Gant's first trial that she could not conclude whether "there was more than the force needed for penetration." In responding the doctor stated that "[o]n further reflection [after testifying at the first trial], I felt quite comfortable in saying that the extent of the trauma indeed does show that force was used."

Defense counsel then asked whether the doctor had changed her testimony. She admitted she had. When defense counsel tried to get the doctor to elaborate on why her testimony had changed, the prosecutor objected and at a bench conference Judge Smith told counsel there is "a misperception of what the doctor is saying"; the judge said the doctor was using force to mean the physical force required for the penis to penetrate the vagina, and not nonconsenting contact. Thereafter, when defense counsel asked the doctor about the nature and scope of her opinion, she elaborated:

> Let me explain a little bit further. The extent of the trauma suggests that there was a lot of pain and tenderness in that area, as evidenced by when I tried to examine [the complainant] and collect the specimens that we talked about before. It was very tender to the touch of a cotton swab that we use for the collection of the specimens.
>
> What I base my findings and conclusions on is the fact that something that was that tender and painful ... normally a person would not submit to that kind of pain unless they were scared. I'm not saying she fought back, but I am saying there was a lot of force used.

Defense counsel proceeded to ask Dr. Wescoe additional questions about her opinion, and to attack her qualifications and bias. In response the doctor admitted that she was not a forensic expert and that she had concluded this was a case of rape.

inadmissible evidence, an objection made upon the answer is timely, and properly made in the form of a motion to strike out the answer. *Id.* at 800. Further, where an objection to evidence is overruled and "afterwards it appears that the evidence was inadmissible, a motion to strike, i.e., a renewal of the objection must be made." *Id.* at 817. "[T]he tardy motion to strike out is justified," Professor Wigmore explains, "not merely because the answer is non-responsive but because it is inadmissible in its tenor." *Id.* at 818. In the absence of a timely motion to strike, the error is reviewed for plain error, in which event the error must be quite clear and

obvious, and Wigmore comments that the party claiming the error carries a far greater burden in convincing an appellate court that the error, even if obvious, was prejudicial. (*Id.* at 796 (citing Fed.R.Crim.Evid., Rule 52(b), n. 2, and § 21) (the prejudice-plus rule)).

19. The doctor had been qualified by Judge Smith to testify "as a Physician of Medicine, Medical Doctor." Defense counsel did not ask to voir dire Dr. Wescoe on her qualifications. She testified that she was in the second year of a pediatric residency when she examined the complainant.

After two other witnesses had testified,[20] defense counsel moved to strike Dr. Wescoe's testimony about "how a person would react or how much pain they would endure," on the grounds that the doctor's testimony was inconsistent with her prior testimony, and beyond her qualifications as a physician.

The trial judge denied the motion to strike, ruling that Dr. Wescoe's testimony meant no more than that there was forced intercourse in the sense of sexual contact between an adult and a pre-menstrual female. However, by the time the doctor explicitly testified that she was changing her testimony and saying more, and certainly by the time she said this was a case of rape, the doctor was stating that there was forced intercourse in the sense that it was accomplished without consent. Dr. Wescoe admitted she was relying, contrary to the trial court's instruction, on her conclusions about "human nature," opining that no one could withstand the pain associated with the physical trauma to the complainant's vagina and continue to engage in sexual intercourse unless she was being raped. In addition, both counsel indicated they thought the witness's testimony had changed: the prosecutor indirectly through his objections and defense counsel directly through his bench conference comments differing with the trial judge's interpretation of Dr. Wescoe's testimony.

Since Dr. Wescoe testified on direct examination, in response to a question whether the penetration was forceful or with consent, that the penetration was forceful, a motion to strike normally would be timely only if it had been made at this point. See supra note 18. Clearly, had the doctor testified on direct examination that this was a case of rape, she would have impermissibly preempted the jury's role.[21] Furthermore, if, on direct examination, the doctor had focused on pain thresholds, the testimony would have been contrary to the trial court's instructions about the basis on which she could express an opinion. Even if the trial court had denied the motion to strike on the latter basis, cf. Baerman v. Reisinger, 124 U.S. App. D.C. 180, 181, 363 F.2d 309 (1966), cited with approval in Grady v. United States, 376 A.2d 437, 438 n. 1 (D.C.1977); McCORMICK ON EVIDENCE § 13, at 33–34, the relaxation of the ultimate facts rule would not extend to Dr. Wescoe's testimony on the ultimate issue before the jury. However, the doctor's testimony on direct examination was somewhat cryptic and not altogether inconsistent with the trial judge's view that the doctor was saying only that the penetration was forced in a medical sense, as distinct from whether or not the complainant had consented. The record does not suggest the parties or Judge Smith thought that Dr. Wescoe's testimony on direct examination expressed an opinion about nonconsenting intercourse.[22] Defense counsel's original objection to the prosecutor's question focused on assuring that Dr. Wescoe would rely on more than the medical evidence (here, limited to the physical examinations) in giving her opinion. The judge rephrased the question accordingly. In addition, defense counsel consented to the

20. The two witnesses were Officer Harrston, the off-duty police officer who objected to Gant's littering, and a co-employee of Gant's, who owned the car that Gant was driving when he took the complainant to the playground.

21. *People v. Schultz*, 260 Ill. 35, 102 N.E. 1045, 1047 (1913) (reversible error to deny motion to strike doctor's testimony, admitted over defense objection, that doctor thought this was a case of rape, where his opinion was based on being told the complainant had been raped, and the doctor was otherwise unable to identify the external violence which caused the inflammation to the genital organs; trial court also refused to let a defense doctor answer whether he thought a rape had occurred, and the prosecutor's closing argument quoted its doctor's opinion as proven fact).

22. Contrary to the government's contention at oral argument, the prosecutor's opening statement to the jury did not alert defense counsel or the trial judge that Dr. Wescoe's testimony on force would differ from her testimony at the first trial.

rephrased question.[23] Further, at a bench conference during cross-examination, Judge Smith commented that he and defense counsel were genuinely surprised by the doctor's changed testimony. Accordingly, since it did not become clear until the doctor testified on cross-examination that she was saying the penetration was non-consenting, a motion to strike would have been timely on cross-examination. *State v. Cain,* 37 S.W.2d 416, 418 (Mo.1931) ("It is only when the ... [objectionable] nature of the testimony has become apparent that the failure to object may constitute a waiver of objection" (quotation omitted)).

The defense questions on cross-examination began in an effort to clarify whether the doctor was using the term "force" in the same sense as she had in her testimony at the first trial. The doctor answered that she was saying the gynecological examination showed more than the physical trauma to be expected when a 12–year-old virgin has sexual intercourse with an adult male, and proceeded to give her opinion about the pain threshold. The answer was objectionable to the extent that it was inconsistent with the trial court's instructions on the basis on which the doctor was competent to testify; it was also unresponsive to the extent it impermissibly invaded the province of the jury. Therefore, had defense counsel made a motion to strike the pain threshold testimony immediately after the doctor completed her answer, the motion would have been timely, and should have been granted. *People v. Schultz, supra* note 21, 102 N.E. at 1047. Since defense counsel did not move to strike the doctor's testimony upon completion of her answer, but instead explored the doctor's opinion about force, focused on her bias, and ultimately elicited her testimony that a rape had occurred, any defense objection to the testimony was waived.[24] Accordingly, we review the admission of the doctor's testimony for plain error,[25] and find none.

23. We are unpersuaded by Gant's contention at oral argument that defense counsel consented only to the prosecutor inquiring whether or not Dr. Wescoe had an opinion, to which the responsive answer would be yes or no. Even if that was the extent of the consent, defense counsel was obliged to object and ask that the answer be stricken if the answer went beyond the consent given.

24. *Cf. O'Dell v. United States,* 251 F.2d 704 (10th Cir.1958). In *O'Dell,* an FBI agent testified on direct examination about three interviews with the defendant while he was in jail. No objection was raised on the ground that the statements were made in the absence of counsel. During cross-examination, after the agent testified about the statements made during the interviews, defense counsel inquired whether the agent had known at the time of the second and third interviews that the defendant was represented by counsel. The trial court held that "any objection to the testimony upon the ground that the interviews occurred during the absence of counsel had been waived and that further cross-examination designed to lay a predicate for such objection was not proper." *Id.* at 708. The Tenth Circuit agreed:

> It is clear that if the objection to the evidence upon the ground that the interviews took place during the absence of counsel was ever available to appellant, it was effectively waived after the evidence had been adduced upon direct examination without objection or challenge and much of it had been amplified in the course of cross-examination. And the objection having been waived, it was not error for the court to decline to permit further cross-examination of the witness for the purpose of laying a predicate for a motion to strike the evidence or of challenging it in some other manner.

> *Id.*

25. In examining the nature of plain error, *Allen v. United States,* 495 A.2d 1145, 1152 (D.C.1985) (en banc), the en banc court quoted the Supreme Court's description of the plain error standard as entailing the *sua sponte* noting by appellate courts, in exceptional circumstances, of error to which no exception was taken in the trial court where "the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). The court observed that this is similar to our expression of the plain error rule in *Watts, supra,* and "helps to explain" why certain errors, if not raised at trial will not be disturbed on appeal. Among errors which do not constitute plain error, the en banc court pointed to cases in which the evidence of guilt is overwhelming or "counsel's failure to object can be viewed as a tactical choice." *Allen, supra,* 495 A.2d at 1152 (citing *Jones v. United States,* 477 A.2d 231, 242 (D.C.1984) (failure to request cau-

Defense counsel was an experienced trial attorney. At no time did he request to voir dire Dr. Wescoe on her qualifications. His disagreement during bench conferences with the trial judge's interpretation of the doctor's testimony makes clear that he was aware of the basis for objecting to the doctor's pain threshold testimony. Hence we conclude that his failure to move to strike until after Dr. Wescoe had completed her testimony was a conscious tactical decision. As such, it can hardly be maintained that an alleged error which is based on that tactical choice constitutes a miscarriage of justice. *Cf. Allen, supra* note 25, 495 A.2d at 1152 (quoting *Adams v. United States,* 302 A.2d 232, 234 (D.C.1973).

In addition, defense counsel was permitted to ask the defense medical expert if he had an opinion, based on the medical records, whether the intercourse between the complainant and Gant was forced as opposed to consenting. Dr. Rudiger Briepeacker, the Director of Baltimore's Rape Center and an experienced forensic pathologist, responded that the medical records were as compatible with consenting intercourse as with forced contact, and that it was "ridiculous" for anyone to think they could tell from the complaining witness' injuries whether or not the sexual intercourse was forced or had occurred with her consent. The clash of expert opinions was reviewed in the closing arguments to the jury. The trial court instructed the jury that it had the "exclusive duty to decide all questions of fact," that it had to decide "where the truth lies" when there was a conflict in the evidence, and further that it was not bound by the opinion of an expert.

Accordingly, defense counsel having made a tactical choice to use cross-examination and a defense expert to attack Dr. Wescoe's testimony rather than moving promptly to strike Dr. Wescoe's pain

threshold testimony, we find no plain error affecting the fairness and integrity of the trial.

## IV.

■ Finally, Gant contends that Judge Revercomb erred in refusing to dismiss the indictment to sanction the extensive prosecutorial misconduct surrounding the first trial, or alternatively, erred in ruling on the motion without holding an evidentiary hearing on the issue of statements made to the press after the first trial by the United States Attorney's Office.

In his brief on appeal Gant points to the following alleged instances of prosecutorial misconduct in the first trial:

First, during cross-examination of appellant, the prosecutor gestured to his law clerk in the gallery to indicate his belief that appellant was lying. Second, in the same cross-examination, he elicited a series of denials from appellant that he had forced [the complainant] into the car and forcibly raped her, then immediately impeached him with a robbery conviction. Third, although the judge had specifically directed that he not refer to the mandatory penalty for rape, the prosecutor asked if appellant knew that he could get probation for carnal knowledge but would have to go to prison for rape. Fourth, in closing argument, the prosecutor deliberately argued evidence outside the record. Fifth, he argued that [the complainant] was entitled to sympathy because, in addition to having been attacked, she had to be asked questions on the witness stand. And finally, in closing, he argued that a verdict of guilty on carnal knowledge "would be a victory for Mr. Gant and a loss for the Government and a loss for [the complainant]."

tionary instruction)). The en banc court also observed that plain error exists "if the error that occurred at trial simply could not have been cured by an immediate objection." *Allen, supra,* 495 A.2d at 1153 (citing *Fields v. United States,* 396 A.2d 522, 528 (D.C.1978)). *Cf. Johnson v.*

*United States,* 387 A.2d 1084, 1086 (D.C.1978) (en banc) (objections to instructions to jury must conform with "[t]he well-settled requirement that trial errors must be objected to at the time they occur if they are to be considered on appeal").

All of these allegations were presented to Judge Revercomb in Gant's motion for a new trial. Judge Revercomb granted a new trial based on the prosecutor's improper impeachment of Gant with his prior robbery conviction. Without deciding whether Gant's other allegations of misconduct would have formed the basis for granting a new trial, we are satisfied that they do not rise to the level necessary to justify dismissal of the indictment,[26] and that a new trial was sufficient to cure any prejudice suffered by Gant as a result of the governmental misconduct during the first trial. *See United States v. Morrison*, 449 U.S. 361, 364–66, 101 S.Ct. 665, 667–69, 66 L.Ed.2d 564 (1981) ("The remedy [should be] limited to denying the prosecution the fruits of its transgression.").

■ Regarding post-trial misconduct by the government, Gant relies first, on the prosecutor's circulation of an inter-office memorandum which "sharply criticized the trial judge and appellant's counsel for their actions during the course of the trial." *Gant, supra*, 467 A.2d at 969. The memorandum was before Judge Revercomb when he was deciding whether to grant the motion for a new trial. Gant also relies on a newspaper story published in the Washington Post on February 13, 1983, shortly after Judge Revercomb granted a new trial, in which the following reference to the United States Attorney's Office appeared:

> Some veteran lawyers yesterday called Revercomb's ruling unprecedented, saying it goes far beyond previous court decisions on what prosecutors can tell a jury about a defendant's criminal record.

Assuming misconduct, the behavior on the part of the United States Attorney's Office did not prejudice Gant's second trial. A new jury was selected, and Gant does not contend the voir dire was inadequate in any respect. Nor does he contend that any prosecutorial misconduct occurred at the second trial. Therefore, we hold that dismissal of the indictment under these circumstances would be a drastic remedy, which would "increase to an intolerable degree interference with the public interest in having the guilty brought to book." *United States v. Blue*, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966).

We also find no reversible error in the denial of an evidentiary hearing about the prosecutor's circulation of the inter-office memorandum while Gant's motion for a new trial was still pending.[27] This court has, in effect, already held that in regard to the prosecutor's motives the memorandum speaks for itself, *Gant, supra*, 467 A.2d at 969–70; therefore, a hearing would have been superfluous. In addition, it seems likely Judge Revercomb either assumed that the prosecutor had spoken to the newspaper reporter or found that the issue of the prosecutor's personal involvement, if any, was legally irrelevant. Such a decision, made by the judge who had tried the case and was familiar with the entire record, and heard counsel's arguments, was well within the ambit of his discretion. *See Pennington v. United States*, 471 A.2d 250, 252–53 (D.C.1983) (trial judge's rulings concerning possibility of prosecutorial misconduct given great weight because trial judge was able to evaluate prosecutor's conduct at trial).[28]

Accordingly, we affirm the judgment.

**26.** Hence we need not decide if this court "has the power, under its supervisory jurisdiction, to hold that some level of prosecutorial misconduct short of that sufficient to trigger the double jeopardy bar, can justify dismissal of an indictment with prejudice...." *See United States v. Harvey*, 392 A.2d 1049, 1051 (D.C.1978) (en banc).

**27.** *See United States v. Kelly*, 790 F.2d 130, 139 (D.C.Cir.1986) (factual findings are particularly important where the governmental misconduct

charged is extraneous to the trial and so is not documented in the trial record (citations omitted). *Cf. Gibson v. United States*, 388 A.2d 1214, 1215–16 (D.C.1978) (motion under D.C. Code § 23–110 (1981)).

**28.** The case principally relied upon by appellant, *United States v. Criden*, 633 F.2d 346 (3d Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981), is not to the contrary. There, the Third Circuit, passing on the trial court's discretionary decision to hold an

**116**

PRYOR, Chief Judge, concurring:

I vote to affirm the convictions, but do not join in Part II of the majority opinion.

I do not think that the trial judge erred in applying the "plain view doctrine" to uphold the seizure of items taken from the residence in which appellant was arrested. Relying upon the same decisions cited in the majority opinion, my difference can be simply stated. Given the fast-moving circumstances surrounding the sighting of a suspect in a sexual attack, the police entered the house to arrest him. After appellant was taken into custody on the second floor, an officer observed certain clothes in a chair in an adjacent room. Still another officer observed a razor and hair particles in an upstairs bathroom.

A critical question then is whether the items seized are the consequence of an exploratory search? We start with the premise that the scope of a warrantless search is limited as to time, place, and circumstance. In a situation, as here, law enforcement officers need not assume, but can reasonably assure themselves that no unknown danger lurks within a house that is being searched. Aside from the security factor, I read *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 '(1969), as rejecting a warrantless rummaging at will, but to allow a contemporaneous search of the immediate area where an arrest occurs. I would offer that *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), instructs that if the police are in a place where they have a right to be, they may act on what they happen to see. A further limitation is that the discovery must be inadvertent in the sense that the police cannot know, in advance, the location of items which they intend to seize before undertaking a search.

In this instance, the police legitimately entered the house, arrested the suspect, and secured the premises for their own safety. Without a warrant, they were not free to conduct a "general" search. However, the *Coolidge* requirement of inadvertence does not mean that police must be inattentive to pertinent evidence in the area of arrest which they observe without obstruction. Here the trial judge ruled, in effect, that the officers observed the items in the course of their lawful intrusions, and not as a result of a broad search. I find no error in that ruling.

evidentiary hearing, stated "the better course is to allow development of a record to the extent necessary *in the trial court's discretion* to permit a concrete evaluation of defendant's motion." *Id.* at 355 (emphasis added).